### COMBS v. UNITED STATES.
### Civ. No. 1035.

United States District Court
D. Vermont.
May 11, 1951.

B. F. Combs, pro se.

Joseph A. McNamara, U. S. Dist. Atty., for District of Vermont, of Burlington, Vt., for U. S.

GIBSON, District Judge.

This action is brought against the United States of America by the plaintiff, Bernie F. Combs, a resident of East Berkshire, Vermont. It is a suit brought under Title 28 U.S.C.A. § 1346(a) (2) of the Judicial Code, and raises a constitutional question.

For many years the plaintiff has operated a slaughter house establishment which is subject to the inspection of meat under the Meat Inspection Act of 1907, as amended, Act May 4, 1907, 34 Stat. 1256. The plaintiff's plant is located in East Berkshire, Vermont, and has been designated by the United States Department of Agriculture as Establishment No. 752.

Under the existing Federal law, one who slaughters meat for shipment in interstate commerce must have the animal given both an ante-mortem and a post-mortem inspection. This inspection service is carried on by the United States Meat Inspection Service, which is in the Bureau of Animal Industry in the United States Department of Agriculture. This Meat Inspection Service has inspectors located near those slaughter houses of this country who slaughter animals and whose meat is put into interstate commerce. The inspector wears a badge and is responsible to see that these slaughter houses maintain proper sanitation safeguards and cleanliness. The inspectors may condemn any animal meat or carcass that they find would be injurious to the public health.

The United States Meat Inspection Service was established by Act of Congress in 1906, Act June 30, 1906, 34 Stat. 669. There had been a law providing for Federal meat inspection prior to that time but the law left much to be desired in affording genuine protection to the consumer. This is evident from the fact that under the prior law occurred the meat scandal of the Spanish-American War period. Therefore, in 1906, the House Committee on Agriculture framed the law having to do with Federal meat inspection, that remained practically intact, at least until May, 1947.

The purpose of Federal meat inspection is to safeguard the public health. One needs only to watch the housewife as she buys meat for her family meal or the restaurant owner as he lays in supplies for his restaurant. Whether the quantity involved is large or small, the buyers recognize instantly and accept without question the mark of Federal inspection and quality which has been stamped on the meat. The buyers accept without question the fact that the animal from which the meat came was healthy and the plant in which the operation was carried on meets the high standards of sanitation.

The Act of 1906 makes it a crime, punishable by a fine of $10,000.00 and two years in prison, to transport or offer for transportation in interstate or foreign commerce any meat or meat product which has not been inspected and passed by a Federal inspector. It provides that there must be inspection of the live animal before slaughter and of the carcass and meat products after slaughter by a competent Federal inspector appointed for that purpose. The Act further provides that establishments in which meat and food products are prepared for interstate commerce must meet high standards of sanitation and that these plants be inspected by experts in sanitation, such experts to be appointed by the Secretary of Agriculture.

Prior to July 1, 1947, payment of these inspectors was the responsibility of the Federal Government. For that purpose, annual appropriations in varying amounts were made. No charge was made against those served by this Meat Inspection Service.

By Act of July 30, 1947, 61 Stat. 531 and 532, which Act was made retroactive to July 1, 1947, it was provided that: "hereafter every person * * * furnished [meat] inspection or service * * * shall pay the United States therefor in accordance with regulations prescribed by the Secretary of Agriculture and at rates and fees to be fixed by him, which payments, * * * shall provide full reimbursement for the estimated cost attributable to the furnishing of such inspection or service, * * *." It also provided that: "payments shall be made for inspection or service rendered on and after July 1, 1947."

The annual appropriation for the fiscal year ending June 30, 1947 was between $11,000,000 and $12,000,000. On May 23, 1947, the House Committee on Appropriations filed its report No. 450 to accompany the Department of Agriculture Appropriation Bill for the year 1948. This recommended that the appropriation for meat inspection be reduced from $11,140,000 to $5,000,000, the latter sum to be used as a revolving fund with assessments to be placed against the meat packer to pay for the cost of inspection. This report further stated that it was contemplated that in the future the meat inspection appropriation would disappear from the annual Appropriation Bill of the Department of Agriculture.

This became a law on July 30, 1947, but its terms were retroactive to July 1, 1947. This Act was in effect repealed by the Act of June 5, 1948, 62 Stat. 344, 21 U.S.C.A. § 98.

Pursuant to the Act of July 30, 1947, the Acting Secretary of Agriculture issued regulations, in words and figures as follows:

"*S 30.1 Fees.* (a) Persons granted the inspection or furnished meat inspection services on and after July 1, 1947 shall pay the United States therefor in accordance with the requirements contained in this part.

"(b) Fees shall be charged against a person granted the inspection or furnished meat inspection services and such fees shall be paid in accordance with the requirements contained in this part.

"(c) All fees provided for in this part shall be paid not later than the last day of each four week period during which such inspection or services are received.

"(d) The chief of Division shall withhold or withdraw the inspection or service upon non-payment of a fee in accordance with the requirements contained in this part.

"*S 30.2 Assurance of payment.* (a) A person who is receiving or who is about to receive any inspection or service shall post a bond or make other assurance of payment.

"(b) The bond or other assurance of payment referred to in paragraph (a) of this section shall cover an amount equal to ten times the total weekly fee. The bond or other assurance of payment shall guarantee payment for all charges for inspection or service including overtime, holiday, and night differential pay referred to in this part.

"(c) The chief of Division shall withhold or withdraw the inspection or service upon failure of a person who has requested or who is receiving the inspection or service to furnish the assurance of payment required in this part.

"*S 30.3 Rates.* (a) In determining the fee to be paid by a person receiving the inspection or service the chief of Division shall designate the number of inspectors necessary for the conduct of an efficient inspection service and such fee shall be stated in terms of man-weeks. The charge for a man-week shall be $89.60 per week.

"*S 30.4 Overtime.* (a) For each hour of inspection or service received by a person during the periods of overtime referred to in S 7.4 of this sub-chapter, except holidays which occur any day Monday through Friday, such person shall pay therefor $2.58 per man-hour.

"(b) For each hour of inspection or service received by a person on a holiday which occurs any day Monday through Friday as referred to in S 7.4 of this sub-chapter, such person shall pay therefor $1.64 per man-hour.

"(c) The overtime charges referred to in paragraphs (a) and (b) of this section

shall be in addition to the payment provided for in SS 30.1, 30.2, and 30.3.

"*S 30.5 Night differential.* (a) For each hour of inspection or service received by a person between the hours of 6:00 p. m. to 6:00 a. m., except when such hours come within a period of overtime referred to in S 7.4 of this sub-chapter, such person shall pay therefor $0.16 per man-hour.

"(b) The charge referred to in paragraph (a) of this section shall be in addition to the payment provided for in SS 30.1, 30.2, and 30.3

"*Finding.* It is found that the notice, public rule making procedure, and effective date requirements of the Administrative Procedure Act (Public Law 404, 79th Congress; 60 Stat. 237), are impracticable and contrary to the public interest with respect to this regulation in that the Department of Agriculture Appropriation Act, 1948, under the heading 'Bureau of Animal Industry', 'Meat Inspection', provides that payments shall be made for inspection or services rendered on or after July 1, 1947, and those regulations are promulgated to effectuate the purposes of that provision."

The plaintiff had been engaged in the operation of a small slaughter house in East Berkshire, Vermont, for many years prior to July 1, 1947. He had had the benefit of Federal Meat Inspection Service. In the fiscal year of 1946, there were slaughtered at the plaintiff's establishment 8,478 animals; in the fiscal year 1947, 7,300; in the fiscal year 1948, which was the year in which the Act complained of was in force, the total number of animals slaughtered in Combs' establishment dropped to 3,536, which consisted of 188 cattle, 3,250 calves and 98 swine, or an estimated total of 450,243 pounds. On a comparative basis, the poundage for the years 1946 and 1947 would have been 1,076,706 and 927,100, respectively.

For the 1948 fiscal year, the Meat Inspection Service of the Department of Agriculture inspected 86,534,649 slaughtered animals, composed of 14,248,351 cattle, 7,595,064 calves, 15,627,907 sheep and lambs, 271,603 goats, 48,550,688 swine and 231,036 horses. This made an estimated total of 18,039,231,930 pounds.

For this meat inspection service during the fiscal year 1948, the plaintiff was charged by the Meat Inspection Service a total of $1,575.84. At some time shortly prior to July 1, 1947, the plaintiff employed as many as fourteen at his establishment. Shortly after he began to be billed for this service, he had to materially cut down, and eventually came down to one man.

If the regulations issued by the Acting Secretary of Agriculture had allocated the cost of the Meat Inspection Service on a poundage basis, the plaintiff's share of the cost would have been approximately $285.00. If these regulations, as promulgated, had chosen as a basis for allocating the cost, the number of heads of animals slaughtered, the plaintiff's proportionate share would have been approximately $456.00.

During this fiscal year, three other small slaughter houses in the Franklin County, Vermont, area did shut down or did cease operations. Report No. 1107 of the Second Session 80th Congress of the Senate Committee on Agriculture and Forestry, in discussing the reasons for the repeal of this levy, says in substance: "When the cost of meat inspection was transferred to the individual packer in 1947 by levying an assessment on each plant for the meat inspection, many of the small packing plants withdrew from interstate commerce to avoid this additional cost. As a result, approximately fifty-one plants have withdrawn from Federal inspection."

After the regulations were published by the Acting Secretary of Agriculture at the end of July, 1947, there were different times that the plaintiff received bills from the United States Department of Agriculture in accordance with the regulations as published. The plaintiff pointed out and claimed errors in some of the bills as rendered, and some of these errors were later corrected. By the winter and spring of 1947–1948, the plaintiff, although billed for service in accordance with the regulations, refused to pay. He notified the Department of Agriculture that he considered the Act unconstitutional. Thereafter, after considerable delay and argument between the Department of Agri-

culture and the plaintiff, the Department secured the balance of the charges that it claimed due it from the plaintiff from the Maryland Casualty Company, who had bonded the plaintiff as required by the regulations. The Maryland Casualty Company was ordered into this case as an involuntary plaintiff but has taken no part in the trial. In all, during this fiscal year, the Department of Agriculture charged the plaintiff $1,575.84 for this meat inspection service. Of this sum, $582.40 was paid by the plaintiff and $993.44 paid by the Casualty Company.

The plaintiff claims the Act herein complained of is unconstitutional for the following reasons:

(a) That the Act was not passed until July 30, 1947, but charges were made against the plaintiff for services rendered between July 1, 1947 and July 30, 1947, and that this was in violation of the Fourteenth Amendment.

(b) That the delegation of authority to the Secretary of Agriculture by the Congress to make these charges was an illegal delegation of power.

(c) That the regulations promulgated by the Acting Secretary of Agriculture were arbitrary, capricious and unreasonable.

(d) That the charge for the service rendered was, in effect, a tax, and thus was an effort to impose a tax on exports in the State of Vermont, and in violation of Article 1, Section 9, of the Constitution.

(e) That the regulation was confiscatory and discriminatory against the operation of a small establishment.

## Conclusions of Law

Before discussing the Conclusions of Law applicable to this case, the Court would like to say it has been extremely handicapped by the failure of the plaintiff to have an attorney present his case for him. The plaintiff insisted on trying his own case without benefit of trained counsel. This procedure, particularly in a case of this nature, makes it extremely difficult for the Trial Judge, and if a point is overlooked that the plaintiff feels should have been considered, it will be because of the failure of the plaintiff to have trained counsel represent him at the trial.

The plaintiff cannot be sustained in his first claim, i. e. that the assessments made against him between July 1 and July 30, 1947, were illegal, because the law was retroactive in that period. It is true that retroactivity is not favored in law. Forbes Pioneer Boat Line v. Board of Commissioners, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647. Congress and the Courts apply the principle sparingly, even where they may, Graham and Foster v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415, but the Constitution does not prohibit retroactive laws. On the contrary, it has been settled for many years that a law of Congress imposing a tax may be retroactive in its operation. Hecht v. Malley, 265 U.S. 144, 164, 44 S.Ct. 462, 68 L.Ed. 949. The validity of such a measure is to be tested by determining whether or not it is subject to some fundamental or constitutional objective apart from its retroactive character. Porter v. Senderowitz, 3 Cir., 158 F.2d 435. The need of the Government for revenue has been deemed a sufficient justification for making a tax measure retroactive whenever the imposition seems consonant with justice and the conditions were not such as would ordinarily involve hardship. Phillip Wagner, Inc. v. Leser, etc., of Baltimore City, 239 U.S. 207, 36 S.Ct. 66, 60 L.Ed. 230. See also discussion in Welch v. Henry, 305 U.S. 134, 147, 148, 59 S.Ct. 121, 83 L.Ed. 87. The Congress, in its wisdom, might well require its Meat Inspection Service to be paid for by those using the service. Such was a matter for Congress to determine, and it did so determine in the Agriculture Appropriation Act of July 30, 1947.

The plaintiff claims that the delegation of authority to the Secretary of Agriculture by the Congress to establish regulations to the end that meat inspection services should be paid for by those served, was an illegal delegation of power. It is, of course, basic that the Congress may not delegate to administrative offices the legislative powers vested in it. Schechter Poultry Corp. v. U. S., 295 U.S. 495,

529, 530, 55 S.Ct. 837, 79 L.Ed. 1570. However, with the great number of governmental problems today and with the mass of intricacies of modern life, the Congress more and more is vesting in administrative offices the administrative powers and functions to carry out its legislative will. U. S. v. Rock Royal Co-op., 307 U.S. 533, 574, 59 S.Ct. 993, 83 L.Ed. 1446. There is no absolute unyielding formula by which one may determine exactly which powers must be exercised by the Congress itself and those which it may delegate to some administrative agency. It is the nature of the power which determines whether the delegation is legal. Panama Refining Co. v. Ryan, 293 U.S. 388, 420, 55 S.Ct. 241, 79 L.Ed. 446. A good distinction is that when the Congress makes a delegation of its legislative powers, it gives some administrative officer a discretion to say what the law shall be. This it may not do, but it can confer on such administrative authority discretion as to how the law having been established by Congress is to be executed. Panama Refining Co. v. Ryan, 293 U.S. 388, 430, 55 S.Ct. 241, 79 L.Ed. 446. In this case, the Congress has provided by law that meat placed in interstate commerce shall be inspected. It further provided in this particular year that the cost of such inspections should be borne by those who use this service. It left nothing to the discretion of the Secretary of Agriculture as to what the law was as to the inspection of the meat placed in interstate commerce, or who was to pay for it. It did leave to his discretion how the meat should be inspected and how the charges for the service should be made. It was, therefore, well within the rights of the Congress to pass the provision of law of which the plaintiff complains and to delegate to the Secretary of Agriculture the discretion as to how to carry out the will of Congress.

It might be well to state right here that it is not for the Courts to determine whether an Act of Congress is wise or unwise. Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 335 U.S. 525, 542, 557, 69 S.Ct. 251, 260, 267, 93 L.Ed. 212. By the wording of this Appropriation Act, the Secretary of Agriculture was given practically unlimited powers to carry out the Meat Inspection Service and to provide for the payment of this expense. The Congress retained no control over it. Apparently Congress thought this was an unsound way of legislating because the following year it took away from the Secretary of Agriculture this particular authority.

The plaintiff further alleges that the regulations promulgated by the Acting Secretary of Agriculture under this Act were arbitrary, capricious and unreasonable. It is quite apparent to this Court that the regulations as actually worked out by the Acting Secretary of Agriculture were, in fact, much more detrimental to the small businessman than to the large packer. As a result, during the time this law was in force, fifty-one small establishments ceased having their meat inspected. Had it been done on a poundage or head basis instead of a man-hour basis, the plaintiff's bill would have been cut two-thirds or three-fourths, and the big packers would have paid correspondingly more.

While this Court might feel that the rules and regulations promulgated by the Acting Secretary of Agriculture were not as wise or as sound as they might have been; while this Court might feel that these rules and regulations did, in fact, favor the big packer as against the small operator; while this Court may disapprove of the action of the Department of Agriculture in charging the plaintiff's plant for some inspection time when the plaintiff's plant was not actually operating; yet as this Court cannot find that the action of the Acting Secretary of Agriculture in establishing these rules and regulations was arbitrary or constituted a flagrant abuse of discretion, it would have no authority to find in the plaintiff's favor. Willapoint Oysters v. Ewing, 9 Cir., 174 F.2d 676, 695; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 182, 56 S.Ct. 159, 80 L.Ed. 138. All of this was, by the Congress, left to the discretion of the Secretary of Agriculture, and the Court cannot superimpose its wisdom on the Secretary's wisdom. Such would result

756

in chaos. If the action of the Acting Secretary of Agriculture was truly a judicious regulation of an occupation for the benefit of the public, the Courts will uphold it within the compass of the police power. If this power is invoked to shield an unfair discrimination, it should receive judicial condemnation. City of Buffalo v. Hill, 79 App.Div. 402, 408, 79 N.Y.S. 449. There is perhaps no class of business calling for more watchful supervision than that of the sale of meats. Its sale affects the public health. In this case, the Secretary of Agriculture was entrusted by the Congress with authority to regulate it and to collect fees to finance this regulation. Power vested was to be exercised in the discretion of the Secretary of Agriculture. We find that in this instance, the Acting Secretary of Agriculture, after conferring with members of the Bureau of Animal Industry, determined that the system of charges for the Meat Inspection Service should be based on man-hours of service and not upon the poundage or head theory. We do not find that in making this decision the Acting Secretary of Agriculture was guilty of any flagrant abuse of discretion or that his act was capricious. The Court, therefore, cannot sustain the plaintiff's claim in this respect.

The plaintiff claims that the charge for the meat inspection service was, in effect, a tax, and therefore was an effort to impose a tax on exports in the State of Vermont, in violation of Article 1, Section 9, of the Constitution. There is no merit in this claim. The Act complained of does not impose a tax on exports in Vermont. There is no claim or evidence to indicate that the charges made were far beyond the amount needed to pay for the cost of inspection. Pure Oil Co. v. State of Minnesota, 248 U.S. 158, 162, 39 S.Ct. 35, 63 L.Ed. 180.

The plaintiff's last point was that the regulation was confiscatory and discriminatory against the operation of a small establishment. What is said as to the plaintiff's third point applies to this, and we find no merit in it.

Judgment for the Defendant—with no costs.