**Shirley MOON, Appellant,**

v.

**Orville FREEMAN, Secretary of Agriculture et al., Appellees.**

**No. 21008.**

United States Court of Appeals
Ninth Circuit.
May 25, 1967.

Wesley Nuxoll, Savage & Nuxoll, Colfax, Wash., Francis Conklin, S. J., Spokane, Wash., for appellant.

John W. Douglas, Asst. Atty. Gen., Carl Eardley, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., Smithmoore P. Myers, U. S. Atty., Spokane, Wash., Neil Brooks, Asst. Gen. Counsel, Robert Bor, Atty., Dept. of Agriculture, Washington, D. C., for appellees.

Before KOELSCH, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

Appellant seeks review of a decision of the District Court denying return of $168.52 that he was required to pay to the Secretary of Agriculture's agent, Commodity Credit Corporation (CCC), for the purchase of export marketing certificates. The jurisdiction of the District Court was based upon 28 U.S.C. §§ 1337, 1346(a) (2); and 15 U.S.C. § 714b(c).

Jurisdiction here is based upon 28 U.S.C. § 1291.

Originally, appellant brought an action in the District Court for the Eastern District of Washington seeking injunctive and monetary relief against enforcement of the portions of the Agricultural Adjustment Act of 1938, as amended, 52 Stat. 31 et seq. (1938), 7 U.S.C. § 1281 et seq. (1964), and regulations enforcing the Act, which required purchase of the export certificates. The theory of that action, as here, was that the charge for the certificates constituted a tax or duty on exports prohibited by Art. I, § 9, Cl. 5, of the Constitution of the United States.[1]

Because the original action sought injunctive relief it was heard before a three-judge panel of the District Court pursuant to 28 U.S.C. § 2282. The panel dismissed the injunctive action holding that appellant's only claim was that the export certificate requirement was a tax and that even if the panel agreed, it could not enjoin operation of a taxing statute. See Int.Rev.Code of 1954, § 7421(a), 26 U.S.C. § 7421(a). The case was remanded to the District Court for trial of the monetary claim.[2] Upon remand the issue was submitted to the district judge upon the existing pretrial order, stipulations of fact, and the briefs. The trial judge granted appellees' motion for summary judgment and denied appellant's. This appeal followed.

The trial judge's reasoning was that the purchase of the export certificates required under the Act was part of a scheme to regulate foreign and domestic commerce in wheat and was not a tax; therefore, Art. I, § 9, Cl. 5, was held to have no application to the program. We affirm. In doing so we have chosen to set out our reasoning at some length since a similar export certificate requirement is a feature of the current Act,[3] and doubts about the constitutionality of a program so important to the economy should be promptly put to rest.

The constitutional significance of the purchase of export certificates required of appellant cannot be fully understood without some knowledge of the history, purposes and operation of the wheat marketing allocation program for the 1964–65 marketing year.[4] The wheat marketing allocation program for 1964–65 is embodied in the Agricultural Act of 1964, 78 Stat. 173, at 178–183, amending the Agricultural Adjustment Act of 1938, 52 Stat. 31, and the Agricultural Act of 1949, 63 Stat. 1051, and in the regulations promulgated by the Secretary of Agriculture pursuant to the Act, 7 CFR §§ 777.2–778.12. The overall program was a continuation of the federal government's efforts to regulate farm production and marketing in order to guarantee an annual income for farmers on a parity with that of other segments of the economy.[5]

The 1964–65 wheat acreage controls and marketing quotas were in name voluntary. The Food and Agriculture Act of 1962, 76 Stat. 605, 626–631, had provided for mandatory acreage controls and marketing quotas, provided that at least two-thirds of the wheat producers voting in referendum favored the controls. However, over a third of those voting did not favor the controls proposed. The Secretary, therefore, determined that mandatory wheat marketing

---

1. "No tax or duty shall be laid on articles exported from any State."

2. Moon v. Freeman, E.D.Wash.1965, 245 F.Supp. 837, 839.

3. See Food and Agriculture Act of 1965, 79 Stat. 1187, 1202–1206, 7 U.S.C. §§ 1379b, 1379c, 1379d, 1379e, 1379g, 1379i, and 1445a.

4. "Marketing year" means the 12 months beginning July 1, and ending June 30. See 7 CFR § 772.3(k).

5. See generally 110 Cong.Rec. 3984, 3985, 4104, 4105, 4343, and Hearings before the Subcommittee on Wheat of the Committee on Agriculture, House of Rep., 88th Cong. 2nd Sess., Serial HH, Part 2, pp. 207–209; Hearings before Senate Committee on Agriculture and Forestry, 88th Cong. 2nd Sess. on S. 1581, 1617, 1946, 2258, 2357, 2492, pp. 32, 38, 41, 171–172. See also Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

quotas would not be in effect for the 1964–65 marketing year.[6]

In light of this situation President Johnson recommended to the Congress a voluntary production and marketing program to take place of the rejected quotas. The need for this program was based upon estimates that without some supplementary program wheat producers would receive "between $500 million and $700 million less in 1964 than they did in 1963."[7] In his message to Congress the President asked for a program which would raise the income of wheat farmers, avoid increases in budgetary costs, maintain the price of wheat at a level which would not increase the price of bread to the consumer, and enable the United States to discharge its responsibilities and realize the benefits under international wheat agreements.[8] The congressional response, after detailed hearings and debate,[9] was Title II of the Agricultural Act of 1964, 78 Stat. 178.

Under the terms of the Act wheat farmers who chose to submit to the Secretary's acreage controls became eligible for domestic and export wheat marketing certificates.[10] The quantity of each variety of certificate in circulation and the number that each cooperating farmer was to receive was determined by a rather complicated formula,[11] the substance of which is: The Secretary first estimated how much wheat in the relevant crop year would be sold for processing into food products for domestic consumption and how much would be exported in the form of wheat or wheat products. Then he determined the percentage of the total amount of this wheat that would have to receive certificate support in order to meet the price and income objectives of the Act.[12]

The cooperating farmer then received a quantity of certificates based on the projected yield of his acreage allotment, the Secretary issuing domestic certificates for the portion of the approved crop that he estimated was bound for domestic use, and export certificates for the portion that he estimated would go into export. In the year here involved the Secretary estimated that 90 per cent of the wheat which would be marketed should be certificate-supported and that half would go to domestic consumption and half to export. Cooperating farmers therefore were issued domestic certificates on 45 per cent of their approved yield and export certificates on 45 per cent. The certificates were issued at one per bushel of projected yield, and a face value was set on each variety of certificate. The Secretary decided, in line with the broad guidelines of the Act,[13] that domestic certificates should have a value of 70¢ and export certificates 25¢. The farmers received their subsidy by selling these certificates to the Secretary's agent, CCC, or to those required to purchase the certificates under the Act. Those required to purchase certificates could buy directly from a cooperating producer or from CCC.

The purchase requirements of the Act were contained in section 202(16), which provided that: "During any marketing year for which a wheat marketing allocation program is in effect, (i) all persons engaged in the processing of wheat into food products shall, prior to marketing any such food product or removing such food product for sale or consumption, acquire domestic marketing certificates equivalent to the number of bushels of wheat contained in such product and (ii) all persons exporting wheat

---

6. 28 Fed.Reg. 6039.

7. 110 Cong.Rec. 1462.

8. Ibid.

9. See note 5, supra.

10. Section 202(8).

11. See sections 202(10), (12), (14), and section 203. For the term "marketing quota," see 7 U.S.C. § 1332(b).

12. In determining the percentage of the marketing quota for purposes of the certificate program, the expected production on the acreage allotments for farms which the Secretary estimated would not be in compliance with the production requirements of the program were to be subtracted from the quota.

13. See section 203.

shall, prior to such export, acquire export marketing certificates equivalent to the number of bushels so exported. In order to expand international trade in wheat and wheat flour and promote equitable and stable prices therefor the Commodity Credit Corporation shall, upon the exportation from the United States of any wheat or wheat flour, make a refund to the exporter or allow him a credit against the amount payable by him for marketing certificates, in such amount as the Secretary determines will make United States wheat and wheat flour generally competitive in the world market, avoid disruption of world market prices, and fulfill the international obligations of the United States. * * * Marketing certificates shall be valid to cover only sales or removals for sale or consumption or exportations made during the marketing year with respect to which they are issued, and after being once used to cover a sale or removal for sale or consumption or export * * * shall be void * * *."

Several important features of the program should be noted. First, the number of marketing certificates is limited once the Secretary determines the extent of subsidization needed to meet the price and income objectives of the Act. The Secretary is not authorized simply to print certificates to provide funds for subsidy, nor is he authorized arbitrarily to set the face value of the certificates, although the Act allows necessary discretion for the initial determinations. Finally, the certificates are voided on use; and, thus, the exclusive relationship to the price and income objectives of the Act cannot be destroyed by continued buying and selling of certificates. In general, what the marketing side of the program established was the setting of wheat prices by requiring the purchase of a fixed number of marketing certificates at a fixed face value. The exact price of wheat of course was determined by the interplay between this program and the free market.

The export certificate portion of the marketing program provided for an adjustment of the certificate price after export so that exports would be encouraged, but the basic purchase requirement remained so that exporters could not undercut wheat prices established by treaty.[14] Refunds on export certificates varied from day to day, depending on the international price of wheat. The record indicates that on numerous occasions the Commodity Credit Corporation actually paid back more than the 25¢ face value of the export marketing certificate, thus providing exporters with a subsidy,[15] although this was not the case on the day appellant sold in export.

Appellant Moon is a wheat farmer in the State of Washington. He elected not to cooperate with the Secretary's production controls for 1964–65. As a non-cooperating producer appellant was not entitled to receive either domestic or export marketing certificates. On January 15, 1965, appellant contracted to sell wheat in export, and on or about January 26, 1965, he exported wheat to Rotterdam. The export certificate liability on this shipment was computed to be $411.93. World wheat prices for the relevant day resulted in a refund of $243.41, and appellant was required to pay a net of $168.52, the sum he seeks to get back in this action.

The trial court held that the export certificate requirement was a legitimate exercise of the federal government's power under Art. I, § 8, cl. 3: "The Congress shall have power * * * to regulate commerce with foreign nations, and among the several States * * *." In asserting that the trial court erred, appellant puts primary reliance upon his theory that Art. I, § 9, cl. 5, is a limitation of the commerce power, as well as of the general power of the federal government to raise revenue. Art. I, § 9, cl. 5, states: "No tax or duty shall be laid on articles exported from any State." Appellant argues that the word "duty"

14. See 7 U.S.C. §§ 1641, 1642.

15. See tables appended to affidavit of Horace D. Godfrey, Administrator of Agricultural Stabilization and Conservation Service, Tr. pp. 48, 49.

broadens the scope of the clause to proscribe monetary impositions used for regulatory purposes whenever such impositions result in an economic burden on exports.

As authority for this proposition appellant cites the history of the constitutional convention. The most persuasive authority from this source in support of appellant's argument that the export clause was intended as a limitation of the commerce power is that when the clause came from the Committee of Detail for general debate, Mr. Clymer of Pennsylvania moved that the words "for the purpose of revenue" be added after the word "duty."

The attempted amendment was defeated. Farrand, The Records of the Federal Convention, Vol. II, p. 363. All of the other convention references cited are either completely ambiguous [16] or consistent with the view that the members of the convention had in mind a limitation only of the power to raise revenue.[17] And it is clear from a reading of the debate preceding Mr. Clymer's proposal that the members were considering the power of taxation, although they recognized that the power to tax could be used to regulate as well as to raise revenue. See id. at 361–363.[18] No special significance such as appellant suggests was

16. For example, appellant cites *Farrand, supra,* at page 143, for the proposition that the Committee of Detail intended the export clause to be a specific limitation on the power to regulate commerce. The following is the full reference, with original emphasis, starting at page 142 of *Farrand:*

"The following are
1. the legislative powers ; *with certain exceptions; and under certain restrictions*
(2 with certain exceptions and)
(3 under certain restrictions)
*agrd.* I. To raise money by taxation, unlimited *as to sum, for the (future) past (or)* [*&*] *future debts and necessities of the union* and to establish rules for collection.
Exception(s)
*agrd.* No Taxes on exports.—Restrictions I. direct taxation proportioned to representation 2. No (headpost) capitation-tax which does not apply to all inhabitants under the above limitation (*& to be levied uniform*) 3. no (other) *indirect* tax which is not common to all.
4. (Delinquencies shall be distress—[illegible words]) 5. To regulate commerce (both foreign & domestic)
2. (No State to lay a duty on imports—)
Exceptions
I. no Duty on exports.
2. no prohibition on (such) (ye) Importations of (such) inhabitants (or People as the sevl. States think proper to admit)
3. no duties by way of such prohibition."
Ambiguities abound because of the confused numbering system and because of the missing transitional words. But even if number 5 is read as restricting the use

of the taxing power so that no tax on exports was to be used for commercial regulation, appellant's argument is not advanced. This restriction is expressly on the power "To raise money by taxation" (see supra), and one would still need to show the regulation was a scheme not only to regulate but also to raise money, *i. e.,* that it was a tax as well as a regulation.

Furthermore, it should be kept in mind that these are the notes of a committee commissioned to compromise, and that the committee reported out the clause almost exactly as now written, not as appellant would have us believe this committee at one time wanted it written. See *Farrand, supra,* at page 183.

17. Mr. Gouverneur Morris of Pennsylvania suggested at one point that the clause would restrict the federal government's power to lay an embargo on exports. *Farrand, supra,* at 360. But Mr. Ellsworth of Connecticut, a member of the Committee of Detail, did not "conceive an embargo * * * interdicted by this section." Id. at 361. The Supreme Court has since agreed with Mr. Ellsworth, thus implicitly holding that the export clause is no limitation on the use of the most extreme form of export regulation, which would, of course, impose a terminal economic burden on exports. See Mulford v. Smith, 1938, 307 U.S. 38, 48, 59 S.Ct. 648, 83 L.Ed. 1092.

18. Particularly revealing are the remarks of James Madison, an opponent of the export clause, which show, as appellant admits, that Madison was concerned about "the power to regulate exports, *through a tax.*" (Quoted from appellant's brief, page 11, emphasis added.) We assume that an imposition on exports designed to

given to the word "duty" in the general debate. The members seemed to consider the word to mean no more than a particular form of taxation.

All of the language appellant cites from Supreme Court cases in support of

raise revenue for the general support of the government could not be squared with the constitution on grounds that it was also a regulation of commerce.

We should also comment that we have read the textbook references appellant has cited in support of the export clause as a limitation on the commerce clause. As with Madison's remarks, we see no indication that these authors viewed the export clause as a specific restriction of the commerce clause. In reference to one authority appellant has engaged in an overly narrow technique of appellate advocacy which is not appreciated by this court. In his brief appellant quotes Story's Commentaries on the Constitution of the United States, as follows:

"No. 1013. The next clause in the Constitution is: 'No tax or duty shall be laid on articles exported from any State' * * *."

"No. 1014. The obvious object of these provisions is to prevent any possibility of applying the power to lay taxes, *or regulate commerce*, injuriously to the interests of any State, so as to favor or aid another * * *. [Emphasis added]."

However, the full quote is as follows:

"§ 1013. The next clause in the Constitution is: 'No tax or duty shall be laid on articles exported from any State. (a) No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; (b) nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another.'

"§ 1014. The obvious object of these provisions is to prevent any possibility of applying the power to lay taxes, or regulate commerce, injuriously to the interests of any one State, so as to favor or aid another. * * *"

19. See Fairbank v. United States, 1901, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (Tax on foreign bills of lading); United States v. Hvoslef, 1915, 237 U.S. 1, 35 S.Ct. 459, 59 L.Ed. 813 (Tax on charter parties); Thames and Mersey Marine Ins. Co. v. United States, 1915, 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821 (Tax on export insurance); A. G. Spalding & Bros. v. Edwards, 1923, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed.2d 865 (Tax on sale

his theory was used in reference to statutes admittedly passed for the purpose of raising revenue, the only question in the cases being whether the tax or duty was "on exports".[19] Thus, Mr. Clymer's attempted amendment and whatever impli-

of exports). In his brief, appellant quotes extensively from Fairbank. The strongest language for appellant's theory that the commerce clause is directly limited by the export clause is found at 181 U.S. 292–293, 21 S.Ct. at 652: "So it is clear that the framers of the Constitution intended, not merely that exports should not be made a source of revenue to the national government, but that the national government should put nothing in the way of burden upon such exports. If all exports must be free from national tax or duty, such freedom requires, not simply an omission of a tax upon the articles exported, but also a freedom *from any tax* which directly burdens the exportation * * *." [Emphasis added.] This statement was made by the Court in response to the government's argument that the stamp tax involved in the case was not *on exports*. The holding was that the whole process of exportation must be free *from tax*. The opinion does not purport to address itself to defining a tax or duty, since that was conceded. But at 181 U.S. 305, 21 S.Ct. 648, the opinion does approve of the conclusion reached in Pace v. Burgess, discussed in text *infra,* that a monetary imposition even in the form of a tax is not a tax within the meaning of the Constitution unless its purpose is to raise revenue.

One case cited by appellant does have language which seems to be directly in support of his theory. Secretary of Agriculture v. Central Roig Ref. Co., 1950, 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381. The exact question in that case was whether the then current sugar marketing allotments were a valid exercise of the commerce power. At 338 U.S. 616, 70 S.Ct. 409, Mr. Justice Frankfurter, speaking for the Court, said, in passing, that "since the Act of 1948 does not even remotely impinge on any of the specific limitations upon the Commerce Clause (Art. I, § 9, cl. 5 and cl. 6), we are not concerned with the vexing problem of the applicability of these clauses * * *."

As Justice Frankfurter indicated, this comment was wholly dictum. It is also consistent with either the theory advanced by appellant, that cl. 5 limits the commerce clause whether or not a revenue raising purpose is involved, or with the theory, adopted by this opinion and oth-

cations can be drawn from its failure stand alone to support appellant. We do not think that the failure of the amendment is persuasive enough to create a limitation on the commerce power—a grant of power in plenary terms. We are confirmed in this opinion by the approach to the interpretation of the commerce and taxing powers and their limitations adopted by Chief Justice Marshall in Gibbons v. Ogden,[20] by the words of the Constitution which expressly limit both powers, and by Supreme Court cases which reject appellant's theory.

In Gibbons v. Ogden Marshall taught that in construing the Constitution the powers of taxation and commercial regulation and the various limitations on those powers were to be considered separately. In particular he decided that the states could not be considered to have retained a general power of commercial regulation because they retained a general power of taxation, inhibited by only narrow restrictions. In reaching this conclusion Marshall showed the way to the resolution of the present problem.

Regarding the federal power over commerce, Marshall said: "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. These are expressed in plain terms * * *." 22 U.S. (9 Wheat.) at 196. As to the taxing power he said: "The grant of the power to lay and collect taxes is, like the power to regulate commerce, made in general terms, and has never been understood to interfere with the exercise of the same power by the states * * *. But the two grants [of commercial regulation and taxation] are not, it is conceived, similar in their terms or their nature * * *. In a separate clause of the enumeration [of federal powers], the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred. The Constitution, then, considers these powers as substantive, and distinct from each other * * *." Id at 198–202.

Rejecting the argument that the limitations imposed by the Constitution on state power to tax commerce showed a power to regulate commerce retained by the states, Marshall said by way of example: " 'A *duty* of tonnage' is as much a *tax*, as a *duty* on imports and exports; and the reason which induced the prohibition of those *taxes* extends to this also. This *tax* may be imposed by a state, with the consent of Congress, and it may be admitted, that Congress cannot give a right to a state, in virtue of its own power. But a *duty* of tonnage, *being part of the power of imposing taxes*, its prohibition may certainly be made to depend on Congress, without affording any implication respecting a power to regulate commerce. *It is true, that duties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce, but they may be also imposed, with a view to revenue;* and it was therefore, a prudent precaution, to prohibit the states from exercising this power. The idea that the same measure might, according to circumstances, be arranged with different classes of power, was no novelty to the framers of our Constitution. Those illustrious statesmen and patriots had been, many of them, deeply engaged in the discussions which preceded the war of our revolution, and all of them were well read in those dis-

---

ers considering the question, that the commerce clause is only limited by cl. 5 insofar as the power is being exercised through a revenue raising device, *i. e.*, only when both the commerce and the taxing powers are being used. See Armour Packing Co. v. United States, 1908, 209 U.S. 56, 79, 28 S.Ct. 428, 434, 52 L.Ed. 681: "But it is to be observed that the Constitution provides for a burden only by the way of taxation or duty, and, unless the alleged interference amounts to such taxation or duty, it does not come within the constitutional prohibition."

20. Gibbons v. Ogden, 1824, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23.

cussions. *The right to regulate commerce, even by the imposition of duties, was not controverted; but the right to impose a duty for the purpose of revenue, produced a war * * *."*

Id. at 202 [emphasis added].

Marshall was not specifically discussing the export clause limitation on the federal government, but we think, and later Supreme Court cases indicate,[21] that the same approach must be taken here. We should not easily suppose that separately stated general powers are limited by words commonly understood to relate only to one of the powers. When the drafters of the Constitution wanted to make it clear that both the commerce power and the taxing power were being limited, they made specific reference. The very next clause to the one now under consideration states "No preference shall be given *by any regulation of commerce or revenue* to the ports of one state over those of another * * *." [Emphasis added.]

Finally, the Supreme Court has heard and rejected the argument made here by appellant that the constitutional convention's failure to add the words "for the purpose of revenue" means that the export clause was intended as a limitation on the commerce power. Pace v. Burgess, 1875, 92 U.S. 372, 23 L.Ed. 657, involved the constitutionality of a charge made for the placing of a special stamp on tobacco to be exported. Under the original Act of 1868 a tax of 32¢ per pound was imposed on all manufactured tobacco except smoking tobacco, which was taxed at 16¢ per pound. The tax was to be paid before the tobacco left the factory. All tobacco intended for export was to have a special stamp bought and affixed before the tobacco left the fac-

tory. That stamp cost 25¢ per package, with no restriction on the size of the package. The 1872 Act reduced the charge for the export stamp to 10¢ per package. This stamp charge was said to be a duty on exports, and it was argued that it was immaterial whether the charge was for regulation of commerce, since the constitutional convention rejected "an amendment proposing to insert, after 'duty' * * * the words 'for the purpose of revenue' * * *." 92 U.S. at 372 (argument for plaintiff in error). The Court's opinion did not stop to mention the argument. The Court concluded that the monetary charge was not a tax or duty in the sense of Art. I, § 9, cl. 5, but a regulatory measure designed to "facilitate the disposal of tobacco intended for exportation" and a "means devised to prevent fraud and secure the faithful carrying out of the declared intent with regard to the tobacco so marked." 92 U.S. at 374–375. To the same effect is Turpin v. Burgess, 1886, 117 U.S. 504, 6 S.Ct. 835, 29 L.Ed. 988.[22]

■ To summarize: Appellant has suggested that the export clause is an across-the-board limitation on the commerce power as well as the taxing power, and that whenever any economic burden is placed upon exports, the export clause is violated. We reject that broad contention. However, the question remains as to the test for determining when a monetary imposition nominally imposed under the commerce power should be considered an exercise of the power to raise revenue and therefore barred by the export clause i. e., when is it a tax and not a regulation.

■ On this question the District Court adopted the test applied by the Sixth Circuit in Rodgers v. United States,

---

21. See e. g., Board of Trustees, etc. v. United States, 1933, 289 U.S. 48, 58, 53 S.Ct. 509, 77 L.Ed. 1025. Cf. Head Money Cases (Edye v. Robertson), 1884, 112 U.S. 580–590–596, 5 S.Ct. 247, 28 L.Ed. 798; Armour Packing Co. v. United States, supra note 19, 209 U.S., at 79, 28 S.Ct. 428. Compare Combs v. United States, D.Ver., 1951, 98 F.Supp. 749, 756.

22. The views expressed in *Pace*, supra, were affirmed in *Turpin*. In addition the Court in *Turpin* was of the opinion that the "taxes" (under the same statute involved in *Pace*) were not "on exports", since they were levied before the tobacco left the factory.

1943, 138 F.2d 992. That court, in considering whether the penalties imposed for noncompliance with the cotton marketing quotas of the original Agricultural Adjustment Act of 1938 amounted to an unproportioned direct tax, said: "The test to be applied is to view the objects and purposes of the statute as a whole and if from such examination it is concluded that revenue is the primary purpose and regulation merely incidental, the imposition is a tax and is controlled by the taxing provisions of the Constitution. Conversely, if regulation is the primary purpose of the statute, the mere fact that incidentally revenue is also obtained does not make the imposition a tax, but a sanction imposed for the purpose of making effective the congressional enactment." 138 F.2d at 994. We consider this an accurate and precise statement of the rule. It is in line with Chief Justice Marshall's approach in Gibbons v. Ogden, supra; it is exactly the test used by the Supreme Court in Pace v. Burgess, supra, when considering the export clause; and it is also the test used by the Supreme Court and other circuits when searching for the dividing line between monetary impositions that are supported by the taxing power and those that are supported by the commerce power.[23] We agree with the District Court that the *Rodgers* test applies here.

■■ Our final problem is to determine whether under this test the monetary imposition upon wheat to be exported which is in question here was a tax or duty in the constitutional sense. We

start with several Supreme Court admonitions. First, "the presumption is in favor of every legislative act, and * * * the whole burden of proof lies on him who denies it constitutionality." [24] Second, "if the Congress may * * * exercise the [commerce] power, and asserts * * * that it is exercising it, the judicial department may not attempt in its own conception of policy to distribute the duties thus fixed by allocating some of them to the exercise of the admitted power to regulate commerce and others to an independent exercise of the taxing power." [25] And third, a cautionary note from the case of Pace v. Burgess, supra: "The point to guard against is, the imposition of a duty under the pretext of fixing a fee * * *. One cause of difficulty in the case arises from the use of stamps [read 'certificates'], * * * stamps being seldom used, except for the purpose of levying a duty or tax. But we must regard things rather than names. A stamp may be used * * * for quite a different purpose from that of imposing a tax or duty * * *. The sense and reason of the thing will generally determine the character of every case that can arise." [26]

■ We have set out earlier the general announced purposes of the wheat marketing allocation program for the 1964–65 marketing year. These are consistent with an exercise of the commerce power. Nothing in the legislative history of the Act indicates that the purpose of the legislation was in any way

23. See Head Money Cases (Edye v. Robertson), supra note 21; Armour Packing Co. v. United States, supra note 19; Child Labor Case (Bailey v. Drexal Furniture Co.), 1922, 259 U.S. 20, 42 S. Ct. 449, 66 L.Ed. 817; Lipke v. Lederer, 1922, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061; United States v. LaFranca, 1931, 282 U.S. 568, 51 S.Ct. 278, 75 L.Ed. 551; Board of Trustees, etc. v. United States, supra note 21; United States v. Butler, 1936, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477; Rodgers v. United States, 1947, 332

U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3; United States v. Stangland, 7 Cir., 1957, 242 F.2d 843. Cf. Morrison Milling Co. v. Freeman, D.C.Cir., 1966, 365 F.2d 525, 529, n. 3.

24. Brown v. State of Maryland, 1827, 25 U.S. (12 Wheat.) 419, 436, 6 L.Ed. 678.

25. Board of Trustees, etc. v. United States, supra note 21, 289 U.S. at 58, 53 S.Ct. at 510.

26. 92 U.S. at 376.

related to the raising of revenue.[27] As the Supreme Court said in Board of Trustees, etc. v. United States, supra, note 21: "The purpose to regulate commerce permeates the entire congressional plan." All indications are that the purpose was to induce producers to comply with crop controls, and to regulate the price of wheat reaching both domestic and foreign markets. It has long since been established that the commerce power will support federal regulation of crops and prices;[28] and whether this is done directly as under former programs, or indirectly through the issuing and buying and selling of marketing certificates is a matter for the discretion of Congress.[29]

Certainly if the record in any way indicated that substantial amounts of revenue had been generated by the sale of export certificates, we would hesitate before deeming the program an exercise of the commerce power. Pace v. Burgess, supra, teaches us to look at things rather than names. But the "thing" of the export marketing certificate program is that funds raised by the sale of export certificates are used by CCC to help defray the cost of purchases from producers, and that in the 1964–65 marketing year, CCC paid out to producers substantially more than it took in from exporters.[30]

27. Congress did face the problem. The question was raised at one point by Congressman Curtis of Missouri, who said: "Section 202(16) also authorizes the Secretary of Agriculture to require any person who wishes to export U. S. wheat to pay a tax to the U. S. Government at the amount which he determines. He estimates that amount at 25 cents per bushel. Our wheat exports could run as high as 800 million bushels. Using the Secretary's estimate, this empowers him to raise approximately $200 million worth of revenue. Article I, Section 9 of the Constitution of the United States states (inter alia): 'No tax or duty shall be laid on articles exported from any State'. "In the past we have rarely had difficulty in understanding this clear prohibition against export taxes. Since we are now supposed to be having an all-out drive to expand U. S. exports, some may feel it is appropriate to test again the constitutionality of a tax levied on exports" 110 Cong.Rec. 6132. Later, Congressman Albert of Oklahoma addressed himself to the question of whether the Act should originate in the House or the Senate: "Finally, the distinction between provisions to 'raise revenue' in the constitutional sense, and others has been well defined by the courts. The construction of this limitation—article I, section 7—is practically well settled by the uniform action of Congress. According to that construction it 'has been confined to bills to levy taxes in the strict sense of the word, and has not been held to extend to bills for other purposes which incidentally create revenue.' " 110 Cong.Rec. 7309.
In fact the marketing certificate sections of the Act did originate in the Senate, not the House, as is required for revenue measures. It was handled in the House by the Agriculture Committee, not the Ways and Means Committee, as would have been the case had the bill been considered a revenue measure; and in the Senate the bill was handled by the Agricultural and Forestry Committee rather than by the Finance Committee. As to whether the export certificate program did in fact raise revenue, see note 30 infra.

28. Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; United States v. Rock Royal Corp., 1938, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

29. See Secretary of Agriculture v. Central Roig Ref. Co., supra, note 19, 338 U.S. at 606, n. 1, 70 S.Ct. 403, 94 L.Ed. 381.

30. From the affidavit of John W. Vaughan, acting controller of CCC, we learn: "3. Under Section 379b and Section 379c, export marketing certificates are issued to producers on 'that portion of the amount of wheat' exported in the form of wheat or products thereof during the marketing year necessary to achieve, insofar as practicable, the price and income objectives of the Act. Producers may sell export marketing certificates to Commodity Credit Corporation or to others. Certificates are also sold by Commodity Credit Corporation to exporters who are required to acquire certificates for wheat exported. The proceeds from the sale of certificates by Commodity Credit Corporation to exporters are deposited to a separate account for Commodity Credit Corporation maintained in the Treasury

Looking at things instead of names from another point of view, we see that appellant was forced to purchase export certificates only because he did not agree to cooperate with the Secretary's production controls. Had he cooperated with the Secretary, he would have received free export certificates for 45 per cent of the projected yield from his approved acreage, and there is nothing in the record indicating that in these circumstances he would have been required to purchase any export certificates for the shipment involved here. This approach shows that appellant was in effect penalized for his failure to cooperate with the regulation of production on his farm. The fact that the program was denominated "voluntary" should make no difference. Other circuits have approved such impositions as incidents of regulation, even where the production or marketing penalized was not forbidden.[31] And such penalties have been upheld against charges that they amounted to a tax on exports.[32]

We hold that appellant has not been forced to pay a tax or duty in the constitutional sense, and that the export marketing certificate program is a valid exercise of the federal government's power to regulate commerce.

Affirmed.

of the United States and are used in the manner stated below.

"4. On the basis of the latest available statistics, it is estimated that approximately 619 million bushels of wheat were exported during the 1964–65 marketing year. This required the purchase by exporters of export certificates costing 25 cents per bushel from Commodity Credit Corporation or others with a total value of approximately $155 million. Of this amount, it is estimated that for the 1964–65 marketing year approximately $125 million will be returned by the Commodity Credit Corporation to the exporters as refunds or credits in accordance with Section 379(b) of the Act, leaving a balance of about $30 million.[1]

"5. Under the 1964 program, export certificates were issued by the Department to producers on approximately 420 million bushels of wheat with a total value of approximately $105 million. Commodity Credit Corporation purchased substantially all of these certificates and sold certificates to exporters for substantially all of the wheat exported during the 1964–65 marketing year. The Corporation is obligated to purchase all unused certificates. The approximately $30 million of the proceeds from the sale of certificates to exporters which is not returned to the exporters as refunds or credits will be used to defray a part of the cost of the export certificates issued to producers and purchased by Commodity Credit Corporation. The balance of approximately $75 million represents a cost to the Commodity Credit Corporation."

\* \* \* \* \*

"1. It is also estimated that the equivalent of approximately 47 million bushels of wheat were exported during the 1964–65 marketing year in the form of flour. This required the purchase by processors of domestic certificates at 70 cents each worth a total of approximately $33 million. It is estimated that nearly all of this amount will be returned to exporters (many of whom are also processors) as refunds or credits under Section 379d(b) of the Act, and, thus, these transactions will not affect the plus or minus position of Commodity Credit Corporation."

Nothing in the record contradicts or weakens this recitation of fact.

31. Rodgers v. United States, 6 Cir., 1943, 138 F.2d 992; United States v. West Texas Cottonoil Co., 5 Cir., 1946, 155 F.2d 463; United States v. Stangland, 7 Cir., 1957, 242 F.2d 843.

32. United States v. West Texas Cottonoil Co., supra note 31 (Cotton raised under contract for export).