**UNITED STATES SHOE CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 95–173.
Court No. 94–11–00668.**

United States Court of International Trade.

Oct. 25, 1995.

Siegel, Mandell & Davidson, P.C., New York City (Brian S. Goldstein, Steven S. Weiser, Laurence M. Friedman and Paul A. Horowitz), for plaintiff.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (John K. Lapiana), Richard McManus, Office of the Chief Counsel, United States Customs Service, and Martin Cohen, Office of the General Counsel, United States Army Corps of Engineers, of counsel, Washington, DC, for defendant.

Baker & McKenzie, Washington, DC (William D. Outman, II, Thomas P. Ondeck and Kevin M. O'Brien) for Brown–Forman Corporation, Fisher Controls International Co., Hewlett–Packard Corporation, International Business Machines Corporation, Minnesota Mining & Manufacturing Corporation and Seagate Technology Corporation, amici curiae.

Barnes, Richardson & Colburn, Chicago, IL (Robert E. Burke, Matthew E. McGrath, Christopher E. Pey, Mark T. Wasden and Cindy H. Chan), for Polaroid Corporation and Amoco Chemical Company, amici curiae.

Coudert Brothers, New York City (Steven H. Becker, Charles H. Critchlow and Claire R. Kelly), for Texaco Refining and Marketing Inc., American Natural Soda Ash Corp., United Export Corp., ABRO Industries, GSI Exim America, Inc., Vitol S.A., Inc., M–C International D/B/A McLane Group International L.P., Bridgestone/Firestone Inc., Dorland Management, Inc., FAI Trading Co., Star Enterprises, Inc., Vista Chemical Co., Champion International Corp., Champion Export Corp. and ISP Technologies, Inc., amici curiae.

Crowell & Moring, Washington, DC (Barry E. Cohen and Mark Tesone), for E.I. du Pont de Nemours & Co., amicus curiae.

DeKieffer, Dibble & Horgan, Washington, DC (J. Kevin Horgan), for Armstrong World Industries, Inc., amicus curiae.

Dorsey & Whitney P.L.L.P., Washington, DC (John B. Rehm and Munford Page Hall, II) for New Holland North America, Inc., amicus curiae.

Grunfeld, Desiderio, Lebowitz & Silverman, New York City, (Steven P. Florsheim and Erik D. Smithweiss), for Boise Cascade Corporation, Etonic Inc., Germain–Webber Lumber Co., Inc., International Veneer Co., Mondial International Corp. and The Heil Co., amici curiae.

Katten, Muchin & Zavis, Chicago, IL (Mark S. Zolno, Lynn S. Baker, Kirk T. Hartley and Michael E. Roll), for Baxter Healthcare Corporation, The Nutrasweet Company and Nestlé U.S.A., Inc., amici curiae.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., Washington, DC (Melvin S. Schwechter, John C. Cleary and Wendy L. Klunk), for Aluminum Company of America, Alcoa International, S.A., Alcoa Inter–America, Inc., Alcoa Memory Products, Inc., H–C Industries, Inc. and The Stolle Corporation, amici curiae.

Irving A. Mandel, Miami Beach, FL, Jeffrey H. Pfeffer, Plainview, NY, Steven R. Sosnov, Norristown, PA, and Thomas J. Ko-

varcik, New York City, of counsel, for Allied Textiles Sales Company, Sheftel International Inc., Fab–Tech Inc., Sirex, Ltd., Debois Textiles, Inc., Capital Textiles, Inc., M. Kopepel Company, Dumont Export Corporation, United Overseas Corporation, Regent Corporation and Muran Universal, Inc., amici curiae.

McKenna & Cuneo, Washington, DC (Peter Buck Feller, Joseph F. Dennin, Michael K. Tomenga, Lawrence J. Bogard and Brian O'Shea), for Swisher International, Inc., amicus curiae.

Neville, Peterson & Williams, New York City, (John M. Peterson, George W. Thompson, Peter J. Allen and James A. Marino), for Aris–Isotoner, Inc., Berwick Industries, Inc., Chevron Chemical Company, Inc., Chevron Chemical International Sales, Inc., Chevron International Oil Company, Chevron Overseas Petroleum, Inc., Chevron U.S.A., Inc., Fieldston Clothes, Inc., General Glass International Corporation, Microsoft Corporation, The Pillsbury Company, Rhone–Poulenc Inc., Uniroyal Chemical Company Inc., Xerox Corporation, Xerox Corporation, Americas Operations Division, Xerox Corporation, Southern California Manufacturing Operations Division and Xerox International Partners, amici curiae.

Rode & Qualey, New York City, Patrick D. Gill and John S. Rode, of counsel, of General Chemical Corporation, Sumitomo Corporation of America, Newell International, Siemens Energy & Automation, Inc., Siemens Power Corp., Siemens Medical Systems, Inc., Siemens Transportation Systems, Inc., Siemens Solar Industries and Unisys Corporation, amici curiae.

Before DiCARLO, Chief Judge and RESTANI and MUSGRAVE, JJ.

## OPINION

DiCARLO, Chief Judge:

Article I, Section 9, Clause 5 of the United States Constitution (the "Export Clause") provides "[n]o Tax or Duty shall be laid on Articles exported from any State." The question presented is whether the Harbor Maintenance Tax, 26 U.S.C. §§ 4461–62 (1988 & Supp. V 1993) (Internal Revenue Code) [hereinafter "Tax"], when imposed upon merchandise exported from the United States, violates this prohibition. The court concludes that it does.

### I

This case comes before the court on cross-motions for summary judgment pursuant to USCIT Rule 56. The parties agree there are no material facts in dispute. They also agree that the court has subject-matter jurisdiction to determine the constitutionality of the Tax.

Congress has given the Court of International Trade jurisdiction over matters arising out of the Tax: "For purposes of determining the jurisdiction of any court of the United States or any agency of the United States, the tax imposed by this subchapter shall be treated as if such tax were a customs duty." 26 U.S.C. § 4462(f)(2). This language directs that taxes imposed upon both imports and exports shall be treated as if they were customs duties, in other words, as import transactions.

Congress's purpose in centralizing jurisdiction over import transactions in the Court of International Trade was to dispel the jurisdictional confusion existing as to the Court of International Trade's predecessor, the Customs Court, and to reflect the true scope of the court's jurisdiction. See H.R.Rep. No. 1235, 96th Cong., 2d Sess. 47 (1980), reprinted in 1980 U.S.C.C.A.N. 3729, 3758–59. As the legislative history of the Customs Courts Act of 1980 shows, Congress sought, by permitting a single court to hear these suits, "to eliminate much of the difficulty experienced by international trade litigants who in the past commenced suits in the district courts only to have those suits dismissed for want of subject matter jurisdiction." H.R.Rep. No. 1235, at 47, 1980 U.S.C.C.A.N. at 3759. Accordingly, Congress granted the court exclusive jurisdiction over any civil action against the United States arising out of federal laws governing import transactions, because of the court's "already developed expertise in international trade and tariff matters." Conoco, Inc. v. United States Foreign–Trade Zones Bd., 12 Fed.Cir. (T) ——, ——, 18 F.3d 1581, 1586 (1994). This authority includes the in-

herent responsibility to review challenges to the constitutionality of a law within that area of expertise. *See* 28 U.S.C. §§ 251, 1331, 1585 (1988) (providing this court with all powers of U.S. district courts including original jurisdiction over actions arising under Constitution); *see, e.g.,* 28 U.S.C. § 255(a)(1) (1988) (permitting designation of three-judge CIT panels to hear and determine constitutional issues). In addition to the statutory language, the legislative history of the Tax supports this court's jurisdiction. S.Rep. No. 228, 99th Cong., 1st Sess. 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6705, 6715.

■ Finally, this is not the first case where the court has taken jurisdiction over matters arising from the Tax; the court recently exercised jurisdiction over claims for restitution of taxes paid by passenger liners pursuant to the Tax in *Carnival Cruise Lines, Inc. v. United States,* 18 CIT ——, 866 F.Supp. 1437 (1994). In sum, in light of the Tax's plain language, its legislative history and the Court of International Trade's traditional role as the proper forum for review of actions governing import transactions, the court possesses jurisdiction to hear and determine the constitutionality of the Tax.

## II

Congress established the Tax as part of the Water Resources Development Act of 1986, Pub.L. No. 99–662, 100 Stat. 4082 (codified as amended in scattered titles of U.S.C.) [hereinafter the "Act"]. While it named the charge imposed upon port users a "tax," 26 U.S.C. ch. 36, subch. A, this nomenclature is not necessarily binding on the court, *see Fairbank v. United States,* 181 U.S. 283, 304, 21 S.Ct. 648, 656, 45 L.Ed. 862 (1901) ("we must regard things rather than names"). The provisions of the Act, including the Tax, are severable. Water Resources Development Act § 949, 33 U.S.C. § 2304 (1988).

The Tax imposes an *ad valorem* tax on "any port use" of federally-maintained navigable waterways. 26 U.S.C. §§ 4461, 4462(a)(2). The statute defines "port use" as "the loading [and] unloading of commercial cargo [on or] from[ ] a commercial vessel at a port," 26 U.S.C. § 4462(a)(1), and "port" as

any channel or harbor open to public navigation that is not an inland waterway, 26 U.S.C. § 4462(a)(2)(A). The Tax is applied against imports and exports, and domestic shipments, as well as passengers. 26 U.S.C. §§ 4461(c)(1), 4462(a)(3)(A). Presently, the amount of the Tax imposed is 0.125 percent of the value of the commercial cargo involved. 26 U.S.C. § 4461(b) (Supp. V 1993). This is without regard to the size of the vessel, the manner or extent of use of port facilities, or the condition of the particular port. For passengers, the statute calculates value based on the actual charge paid for the transportation. *See* 26 U.S.C. § 4462(a)(5)(B). Further, Congress does not distinguish among port users or particular ports in expending funds for harbor maintenance or operations, even though some ports or users may contribute the majority of the fees paid.

The Tax exempts certain cargo and passengers from its burden. These exemptions include fish or other aquatic animals not previously landed on shore, ferry passengers, bunker fuel, ships' stores, or equipment necessary for operation of a vessel, bonded commercial cargo entering the United States for transhipment to a foreign country, and any cargo shipped between the continental United States and Alaska, Hawaii or any U.S. possession for ultimate consumption at its destination with the exception of crude oil transported from Alaska. 26 U.S.C. § 4462. The Tax also exempts intraport movement of cargo, recreational and *de minimis* port use, port use by the U.S. government, and humanitarian and development assistance cargo. *Id.* Congress's stated purpose in enacting the Tax was to have commercial shippers fund the maintenance of U.S. harbors and ports. *See* S.Rep. No. 228, at 5, 1986 U.S.C.C.A.N. at 6709; S.Rep. No. 126, 99th Cong., 1st Sess. 7 (1985), *reprinted in* 1986 U.S.C.C.A.N. 6639, 6644.

In enacting the Tax, Congress concurrently established the Harbor Maintenance Trust Fund, 26 U.S.C. § 9505 (1988 & Supp. V 1993) [hereinafter "Trust Fund"], to carry out the purposes of the Act. Monies collected pursuant to the Tax are transferred to the Trust Fund for disbursal upon further appro-

priation by Congress in accordance with the Trust Fund's provisions. 26 U.S.C. § 9505(b), (c). Since 1991, Congress has authorized appropriations from the Trust Fund to offset up to 100 percent of the eligible operation and maintenance outlays for harbors under the Act. Water Resources Development Act of 1990 § 316, 33 U.S.C. § 2238 (Supp. V 1993). Congress did not limit expenditure of Tax revenues to the U.S. Army Corps of Engineers, the largest beneficiary of the Trust Fund. Rather, the Departments of the Treasury and Commerce, and the National Oceanic and Atmospheric Administration are also potential recipients of Tax revenues. 26 U.S.C. § 9505(c); see Office of Management and Budget, Executive Office of the President, *FY 1996: Budget of the U.S. Government, Appendix,* 376, 802 (1995).

Despite the number of agencies eligible to receive funds, the Trust Fund has been running a yearly surplus since its inception. This surplus burgeoned with the increase in the Tax from 0.04% to 0.125%, (Br. of *Amicus* Amoco Chem. Co., Ex. A (*Second Annual Report to the Congress on the Status of the Harbor Maintenance Trust Fund For Fiscal Year 1993* 5 (1994))) [hereinafter "*Second Annual Rep.*"], and is "on budget." The practice of listing trust fund revenues on budget permits them to be included in calculations of the federal budget deficit. Thus, any monies contributed by such funds to the budget decreases the Treasury's need to borrow in order to finance the federal deficit. *See* H.R.Rep. No. 251 pt. III, 99th Cong., 1st Sess. 19 (1985) ("[t]he increase in net budget receipts [provided by the Tax] will reduce the potential Federal budget deficit by a like amount by providing a new source of user-related revenues rather than relying completely on general fund appropriations"). As of 1994, the government had collected over 500 million dollars from exports alone. (*See* Br. of *Amicus* Polaroid Corp., Ex. A (*First Annual Report to Congress on the Status of the Harbor Maintenance Trust Fund Fiscal Years 1987–1992* 4 (1993))) [hereinafter "*First Annual Rep.*"]; *Second Annual Rep.* at 3.

Plaintiff paid the Tax on articles exported for the period April 1 through June 30, 1994. It now sues for recovery of those monies, claiming imposition of the Tax violates the Export Clause.

## III

■ An act of Congress is presumed to be constitutional. *Fairbank,* 181 U.S. at 285, 21 S.Ct. at 649. Any excess in the exercise of legislative power or conflict with the restrictions imposed by the fundamental law should be clear before the court overturns an enactment of the legislature. *Id.* Yet, as Chief Justice Marshall expounded in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), "the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that courts, as well as other departments, are bound by that instrument." *Id.* at 180.

### A.

Defendant contends that the Tax is a valid exercise of Congress's constitutional authority to regulate foreign and interstate commerce, and does not implicate its taxing powers. According to defendant, although the Export Clause restrains those powers, the Clause cannot circumscribe Congress's unlimited capacity to regulate commerce.

The court concludes the power to regulate commerce does not eclipse the Export Clause. Although Congress can adopt the methods it deems necessary to accomplish its goals pursuant to the regulation of commerce, this authority is limited by other provisions of the Constitution. *United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1627, 131 L.Ed.2d 626 (1995) (providing that commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution") (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824)); *North Am. Co. v. S.E.C.,* 327 U.S. 686, 704–05, 66 S.Ct. 785, 795–96, 90 L.Ed. 945 (1946) (noting Congress's commerce powers are limited by express provi-

sions in other parts of Constitution); *Rodgers v. United States,* 138 F.2d 992, 994–95 (6th Cir.1943). Accordingly, even if the court were to find the Tax to be a charge imposed under the commerce power, such a charge is still subject to the restrictions of the Export Clause if it in fact serves as a tax or duty. For example, a charge upon exports imposed under the Commerce Clause as a user fee, or to regulate commerce, would not be immune from the restrictions of the Export Clause if the court found the charge actually to be a tax or duty on exports. The court looks to substance over nomenclature.

The origin of the Export Clause indicates it is to have broad effect. Two amendments seeking to limit it were rejected. The first would have limited the Clause by adding "for the purpose of revenue" to the prohibition against taxes or duties on exports. II *The Records of the Federal Convention of 1787* 363 (Max Farrand ed., 1937). The second amendment would have permitted export taxes if approved by a two-thirds majority in both Houses of Congress. Note, *Constitutionality of Export Controls,* 76 Yale L.J. 200, 203 (1966). The Constitutional Convention deliberately chose to leave exports unburdened; and, in so doing, persuaded the South to join the new union. *See id.* at 204. For the Southern States, the Export Clause addressed concerns that a Congress controlled by the North would impose burdensome levies on southern exports. *International Business Machs. Corp. v. United States,* 13 Fed.Cir. (T) ——, ——, 59 F.3d 1234, 1236 (1995) [hereinafter *"IBM"*].

■ The Export Clause serves to keep all exportation free of any tax burden. *Fairbank,* 181 U.S. at 290, 21 S.Ct. at 651. As the Court in *Fairbank* explained, "[i]f all exports must be free from national tax or duty, such freedom requires not simply an omission of a tax upon the articles exported, but also a freedom from any tax which directly burdens the exportation." *Id.* at 293, 21 S.Ct. at 652.

### B.

■ The court finds the Harbor Maintenance Tax as it applies to exports constitutes a tax prohibited by the Export Clause and does not fall under Congress's Commerce Clause powers. Defendant contends the Water Resources Development Act does not establish a tax upon exports in violation of the Export Clause, because enhancement of the general revenue is not its primary purpose, but is merely one aspect of a comprehensive legislative program providing for conservation and development of the nation's water resources infrastructure. According to defendant, the value of the benefit provided by the program, maintenance of safe and efficient ports and harbors, reasonably relates to the charges imposed and accrues, at least in part, to an identifiable private beneficiary. In considering the Act as a whole, defendant contends Congress simply imposed a user fee "for the purpose of making effective the congressional enactment." (Def.'s Mem. in Opp'n to *Amici* at 54) (quoting *Moon v. Freeman,* 379 F.2d 382, 391 (9th Cir.1967)).

For defendant to succeed on this argument, the court must find that regulation is the primary purpose of the Tax, *see South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 887 (4th Cir.1983), *cert. denied* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984), or alternatively, that Congress sought to raise money to recoup the costs of services provided to the payer pursuant to a regulatory scheme, *see Pace v. Burgess,* 92 U.S. 372, 375–76, 23 L.Ed. 657 (1876). The Tax serves neither purpose.

First, the Act neither discourages nor regulates use of a harbor; neither does it so intend. In *Moon,* the court upheld an export certificate program for wheat farmers. 379 F.2d at 391–93. It found the program's monetary imposition for overproduction, essentially a penalty for non-compliance with the Secretary of Agriculture's production controls, did not violate the Export Clause. *Id.* The court held where regulation is the primary purpose of the statute as a whole *and* revenue also is obtained incidentally through imposition of sanctions, the Constitution will not necessarily prohibit the charge. *Id.* at 391 (quoting *Rodgers,* 138 F.2d at 994). Here, the Act does not have regulation as its primary purpose. For example, it does not seek to control the amount or manner of port use. Further, the Act does not seek to influ-

ence commercial practices, or seek to enforce compliance with a legislative goal as did the Agricultural Adjustment Act of 1938, as amended by the Agriculture Act of 1964, considered in *Moon*, or the Agricultural Act of 1949, as amended, considered in *Block*. Congress instead sought funding for the extensive maintenance projects envisioned under the Act. S.Rep. No. 126 at 7, 1986 U.S.C.C.A.N. at 6644 (noting Congress intended Harbor Maintenance Tax as new tax to cover portion of Federal spending on harbor maintenance).

Second, there is little indication that Congress intended to establish a user fee. Rather, Congress found an alternative way to fund expenditures it intended to make. When Congress enacted the Tax, it intended to use the Tax to pay the costs of developing, operating, and maintaining port projects. H.R.Rep. No. 251, at 19; S.Rep. No. 228, at 5, 1986 U.S.C.C.A.N. at 6709. The Act permitted disbursement of Tax proceeds to the U.S. Army Corps of Engineers for recovery of up to 40 percent of its eligible operation and maintenance outlays. Water Resources Development Act of 1986 § 210(a)(2), 33 U.S.C. § 2238(a)(2) (1988); *see First Annual Rep.* at 1 (noting "[f]ederal expenditures for [port and harbor maintenance] were determined to be synonymous with expenditures made by the Army Corps of Engineers"). The Water Resources Development Act of 1990 increased the rate of the Tax and allowed the Corps of Engineers to recover up to 100 percent of its "eligible operations and maintenance costs." 33 U.S.C. § 2238(a)(2) (Supp. V 1993). Since its inception, the Trust Fund has accumulated significant surpluses. *See* 141 Cong.Rec. E519 (daily ed. Mar. 6, 1995) (statement of Rep. McDermott). Accordingly, we take note of the warning in *Moon*, "[c]ertainly if the record in any way indicated that substantial amounts of revenue had been generated by the sale of export certificates, we would hesitate before deeming the program an exercise of the commerce power." 379 F.2d at 392.

■ The court finds the primary purpose of the Tax is to raise revenue, as Congress has imposed "a duty under the pretext of fixing a fee," *Pace*, 92 U.S. at 376. For a charge to withstand constitutional challenge under the Export Clause, it must defray costs of services rendered pursuant to the regulation of commerce, and the taxes collected may not be excessive. In the *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 595–96, 5 S.Ct. 247, 252, 28 L.Ed. 798 (1884), the Supreme Court upheld a *per capita* charge on non-U.S. citizens arriving in the United States by ship. The Court found the statute in question imposed the fee to defray costs appropriated in advance for inspection of immigrants before landing, and for their care and provision afterward. *Id.* at 590, 5 S.Ct. at 249. The Secretary of the Treasury was to "distribut[e] the fund in accordance with the purpose for which it was raised, not exceeding in any port the sum received from it." *Id.* As such, the charges imposed were incidental to the regulation of commerce and directly reimbursed the costs of services rendered to the individual.

Similarly, in *Pace*, the Supreme Court concluded that a fee for stamps used to distinguish tobacco intended for export—and thus to alleviate it from the heavy exactions placed upon tobacco sold domestically—was not a tax on exports. *See* 92 U.S. at 375–76; *see also Turpin v. Burgess*, 117 U.S. 504, 6 S.Ct. 835, 29 L.Ed. 988 (1886) (sustaining, on similar grounds, constitutionality of charge imposed to identify tobacco packages intended for export). Rather, the Court characterized the stamp as a fee "accruing in the due administration of the laws and regulations," serving simply as "compensation given for services properly rendered." *Pace*, 92 U.S. at 375. The Court found the payment for the services rendered, through identification of tobacco exported, was no different than "the fee for clearing the vessel in which [the tobacco] was transported, or for making out and certifying the manifest of the cargo." *Id.* The amount of the fee never exceeded the costs to produce the stamps and the cost of services necessary to give the exporter the benefit of the exemption from taxation; identification of the tobacco provided the exporter the direct benefit of a domestic tax exemption.

In contrast, little nexus binds the imposition of the *ad valorem* tax on cargo to the

costs of port maintenance and regulation of shipping. As the exaction is tied to value and there is no mechanism to ensure that the fees collected will be used "only or primarily for the cost of" port maintenance associated with the shipping that is taxed, the Tax is not a user fee imposed under the commerce power. The fees collected, rather, yield funds for the purpose of maintaining and developing American ports and harbors for all uses, commercial and recreational. Further, the Tax funds projects yet to be commenced, or even envisioned, rather than services already rendered. Application of the Tax has produced a substantial surplus in excess of the costs incurred. The court therefore finds the Tax raises revenue, and is not a user fee imposed pursuant to the regulation of commerce.

The Supreme Court recently has used another test to distinguish between an impermissible tax and a user fee. In *Massachusetts v. United States*, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978), the Court considered whether an aircraft registration fee levied on state police aircraft violated the judicially-implied intergovernmental tax immunity doctrine first set forth in *Collector v. Day*, 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1871). In concluding that it did not, the Court relied on three criteria derived from *Evansville–Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). To constitute a user fee, as contrasted with a tax, the Court held: (1) the charge must not discriminate against the constitutionally-protected interest; (2) the implementing authority must base the charge upon a fair approximation of the use of some system; and (3) the charge must be structured to produce revenue fairly apportioned to the total cost to the government of the benefits conferred. *Massachusetts*, 435 U.S. at 466–70, 98 S.Ct. at 1166–68.

The Tax fails classification as a user fee under the test presented in *Massachusetts*. Although the Export Clause clearly is designed "to protect constitutionally valued activity from undue burden" that could result from certain taxing measures, *see id.* at 462, 98 S.Ct. at 1164, the court need not decide the issue of whether the tax is discriminatory. Even assuming, *arguendo*, that the Tax is nondiscriminatory, the court finds the Tax fails the remaining two prongs of the *Massachusetts* test.

First, the charge is not based upon some fair approximation of the cost of the benefits port users receive from harbor maintenance and development projects. Low value bulk cargo importers and exporters use port facilities to a much greater extent than high value non-bulk cargo importers and exporters. Yet, the cost to the latter is greater than that to the former. Further, most large ports paying the majority of the costs receive no more than 30% back in maintenance expenditures. (*See, e.g.,* Br. of *Amicus* Amoco Chem. Co., Ex. G (Army Corps of Engineers, *Estimated Receipts of Harbor Maintenance Fee from Cargo Transiting Major Ports* (1992))) (draft document) (noting of $78,711,000 estimated collected 1992 taxes on exports and imports from Port of Los Angeles, only $162,000 returned in port operation and maintenance expenditures). Additionally, although only certain commercial users must pay the tax, they are not the sole users of the ports nor the only beneficiaries of the maintenance and development projects. Based on the foregoing, the court does not find the charge imposed under the Tax is based on a fair approximation of the costs of benefits received by port users.

Second, the charge is excessive in relation to the cost to the government. The Tax is used to fund projects yet to be commenced, or even envisioned, rather than to repay the government for services rendered. The Tax has produced a substantial surplus, that is rapidly expanding, in excess of costs incurred. *Second Annual Rep.* at 5.

In sum, the Tax neither seeks to regulate Commerce nor repay the costs of services rendered; moreover, the Tax fails the alternative test provided by *Massachusetts*. Accordingly, the Tax is subject to the prohibitions of the Export Clause.

### C.

Defendant questions whether the Harbor Maintenance Tax is a tax levied upon "exported articles" within the meaning of the

Export Clause. According to defendant, a tax or fee only violates the Export Clause if it is levied on goods by reason of their exportation, *e.g.,* if such goods have entered the export stream. Defendant contends the broad prohibition of the earlier cases against a tax upon goods having entered the export stream was curtailed by *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), and further constrained in *Department of Revenue v. Association of Washington Stevedoring Cos.,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978).

Further, according to defendant, imposition of the Tax upon loading of freight is merely intended to ensure that those who actually use the ports would pay. As such, the time when the Tax attaches has no other significance for purposes of assessment of the fee upon exports. The motivation behind imposing an *ad valorem* charge, defendant insists, was to minimize possible competitive disadvantages among cargo types and U.S. ports that would have arisen from a user charge.

In any case, defendant argues the *Michelin* and *Washington Stevedoring* tests now examine the nature of the tax at issue, rather than the status of the article. Those cases explored whether the taxes were upon "exports as such" and whether they offended the policies protected by the framers of the Constitution. Those policies, defendant argues, include promoting uniformity among the former colonies and preventing the North from crippling the export-dependent Southern States pursuant to the Import–Export Clause. U.S. Const. art. I, § 10, cl. 2 ("No States shall . . . lay any Imposts or Duties on Imports or Exports . . . ."). Specifically, defendant contends *Michelin* established that a nondiscriminatory *ad valorem* property tax did not violate the Import–Export Clause simply because it applied to recently imported goods—there, tires maintained at a wholesale distribution warehouse. 423 U.S. at 286, 96 S.Ct. at 541. Similarly, defendant contends *Washington Stevedoring* held that a nondiscriminatory local tax that compensates the state for services rendered also failed to implicate the concerns of the Import–Export Clause. 435 U.S. at 755, 98 S.Ct. at 1401.

Integral to these tests, defendant contends, is the court's examination of whether the charge discriminates in imposing its burden. According to defendant, a nondiscriminatory charge for a service that facilitates export activity does not violate the Export Clause. Defendant maintains the Tax is such a charge. The court disagrees.

In examining whether the Tax burdens "exported articles," the court limits its inquiry to the Export Clause, for there is a distinct difference in language between the Import–Export Clause and the Export Clause. *See IBM,* 13 Fed.Cir. (T) at ——–——, 59 F.3d at 1238–39. The decisions in *Michelin* and *Washington Stevedoring* attached significance to the distinction between "Imposts and Duties," and the Export Clause's broader prohibition. *See Michelin,* 423 U.S. at 290, 96 S.Ct. at 543; *Washington Stevedoring,* 435 U.S. at 759–60, 98 S.Ct. at 1404. As the Supreme Court in *Michelin* noted, the Import–Export Clause only bans "Imposts or Duties" and is not "a broad prohibition of every 'tax.'" 423 U.S. at 290, 96 S.Ct. at 543. According to the Federal Circuit, a difference in policy intended by the framers of the Constitution underlies the difference in language:

> While the Import–Export Clause was intended to prohibit States from imposing a 'transit fee' on goods moving in foreign commerce, the Export Clause served the broader purpose of 'forbid[ding] federal taxation of exports.' The Supreme Court's current narrower view of the prohibition in the Import–Export Clause thus does not dictate that the Export Clause be given a similarly narrow construction.

*IBM,* 13 Fed.Cir. (T) at ——, 59 F.3d at 1239 (citations omitted). Defendant's citations of *Michelin* and *Washington Stevedoring* are, thus, inapplicable.

Moreover, even if this court were to assume *Michelin* and *Washington Stevedoring* apply to the Export Clause, the cases remain distinguishable. *Michelin* concerned imported tires that had already lost their identity as a unit and as an import after being unloaded and stored within a warehouse. *See* 423 U.S. at 280, 96 S.Ct. at 538. At the warehouse, workers unloaded the containers in which the

tires were shipped, sorted the tires by size and style, and stacked them on wooden pallets, without segregation by place of manufacture. *Id.* The tires required no further processing to ready them for sale and delivery to franchised dealers. *Id.* In this sense, the Court found the warehouse operated "no differently than ... a distribution warehouse utilized by a wholesaler dealing solely in domestic goods." *Id.* at 302, 96 S.Ct. at 548. Accordingly, the holding in *Michelin* turned on the fact that the goods were no longer in import transit. *Id.* at 286, 96 S.Ct. at 541.

As distinguished from the unloaded and unpacked imports in *Michelin,* the cargo taxed in this case has entered the stream of exports. The cargo, as it is loaded on board the vessel, is in transit, and the Tax falls upon the merchandise itself. As such, it is an article protected by the Export Clause. *Michelin* is inapplicable.

In *Washington Stevedoring,* the Supreme Court upheld a business and occupation tax imposed by the State of Washington upon the value of certain *services* rendered—the loading and unloading of cargo. *Id.* at 737, 758, 98 S.Ct. at 1392, 1403. The Court distinguished the stevedoring services from maritime insurance policies covering such goods. *Id.* at 756 n. 21, 98 S.Ct. at 1402 n. 21. The Court found placing a tax upon the insurance policies was more suspect, and likely unconstitutional as a violation of the Import–Export Clause, because "the value of goods [bore] a much closer relation to the value of insurance policies on [those goods] than to the value of loading and unloading ships." *Id.* As the amount of the Tax *ad valorem* is tied directly to the value of the goods, *Washington Stevedoring* is equally inapplicable.

■ Two distinct tests have evolved from case law for determining whether the Export Clause will immunize an article from taxation. First, the court must examine the immediacy of exportation. Second, the court considers the proximity of the tax imposed to the value of the articles exported. Here, neither test supports the constitutionality of the Tax.

■ In delineating a zone where an article in the stream of commerce melds into the export stream, the court looks to see whether the article is in the actual process of exportation, and whether it "has begun its voyage or its preparation for the voyage." *Cornell v. Coyne,* 192 U.S. 418, 428, 24 S.Ct. 383, 385, 48 L.Ed. 504 (1904). For instance, where exported articles were delivered to the carrier and title passed, the Supreme Court found those articles had entered the process of exportation. *A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 68–70, 43 S.Ct. 485, 485–86, 67 L.Ed. 865 (1923). Thus, taxing such articles would have been unconstitutional. Although other actions may have been necessary before the goods would have been in transit, "so long as [these actions] were only the regular steps" taken to export such goods, the effect of the sale was to start the goods upon their voyage abroad. *See id.* at 69–70, 43 S.Ct. at 486.

Constitutional freedom from the taxation of exports involves more than mere exemption from taxes laid directly upon the articles exported. In *Fairbank,* the Court held that a stamp tax imposed on a foreign bill of lading was equivalent to a tax upon the articles listed, and therefore contrary to the Export Clause. 181 U.S. at 312, 21 S.Ct. at 660. The Court noted exports almost always require bills of lading. *See id.* at 294, 21 S.Ct. at 652 (citing *Almy v. California,* 65 U.S. (24 How.) 169, 174, 16 L.Ed. 644 (1861)) (noting necessities of foreign commerce always require association with bill of lading or similar written instrument). By placing a tax on the bill of lading, the Court reasoned, Congress had violated the letter and spirit of the Export Clause. *See id.* at 290–291, 300, 312, 21 S.Ct. at 651–652, 655, 660.

Similarly, in *Thames & Mersey Marine Insurance Co. v. United States,* 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821 (1915), the Supreme Court found a tax upon policies of marine insurance on exports prohibited by the Constitution. In reaching its determination, the Court inquired whether the tax imposed was so directly and closely related to the process of exportation that the tax was in substance a tax upon the exports themselves. *Id.* at 25, 35 S.Ct. at 498. The Court

found its answer within the dynamics of trade and commerce: where commerce requires an item for exportation—such as a written instrument necessarily and always associated with the export of articles of commerce—taxation of that item serves as taxation of the exported article. *Id.* at 26–27, 35 S.Ct. at 498–99. This prohibition of the Export Clause also has been applied to taxes upon charter parties, contracts for the carriage of full cargo lots, *United States v. Hvoslef,* 237 U.S. 1, 16–17, 35 S.Ct. 459, 464, 59 L.Ed. 813 (1915) and, more recently, to excise taxes on premiums paid to foreign insurers, *IBM,* 13 Fed.Cir. (T) ——, 59 F.3d 1234.

■ Here, Congress imposed the Tax directly upon exports well along the stream of exportation. The Tax is assessed at the time of loading the cargo. 26 U.S.C. § 4461(c)(2). As a tax imposed upon delivery of cargo to a carrier violates the Export Clause, *see A.G. Spalding,* 262 U.S. at 68–70, 43 S.Ct. at 485–86, a tax imposed on the further step of loading such cargo onto the vessel also falls within the prohibition of the Clause.

The Tax is assessed *ad valorem* directly upon the value of the cargo itself, not upon any services rendered for the cargo, or upon any instruments of commerce that accompany the goods. Further, an *ad valorem* tax is levied in direct proportion to an article's value. Congress could not have imposed the Tax any closer to exportation, or more immediate to the articles exported.

Accordingly, the court concludes the Tax is prohibited by the Export Clause and it need not address *amici*'s (claimants in other cases) contentions pertaining to whether the Tax also violates the Due Process Clause or the Port Preference Clause of the Constitution.

## IV

As indicated, the parties agree that this court has subject matter jurisdiction, *see supra* p. 410, but disagree as to the specific basis upon which exporters may make claims. Two subsections of the court's jurisdictional statute may provide the parties a route for judicial review. *See* 28 U.S.C. § 1581(a), (i)

(1988 & Supp. V 1993). Subsection 1581(a) provides for review of a denial by the Customs Service of a protest of certain duties, charges, exactions, or drawbacks. 28 U.S.C. § 1581(a); 19 U.S.C. § 1515 (1988 & Supp. V 1993). A party must protest a Customs decision within 90 days of the date of the decision to be protested. 19 U.S.C. § 1514(c)(3)(B) (Supp. V 1993). On the other hand, subsection 1581(i) gives the court broad residual authority over civil actions arising out of federal statutes governing import transactions. *Conoco,* 12 Fed.Cir. (T) at ——, 18 F.3d at 1586. Subsection 2636(i) of the same title requires a party to commence an action under subsection 1581(i) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i) (Supp. V 1993). The court's decision as to the appropriate jurisdictional basis relates to the amount of plaintiff's recovery.

### A.

Defendant argues jurisdiction is only proper under subsection 1581(a). According to defendant, the court may review challenges to the constitutionality of the Tax only where an exporter properly protests its payment, and seeks review of the denial of that protest. Although defendant concedes that "neither jurisdictional provision may fit exactly," (Tr. of Oral Argument at 24 (June 27, 1995)) [hereinafter "Tr."], defendant contends permitting this case to rest upon any other jurisdictional ground would greatly expand the government's liability and would disregard the only congressionally-mandated avenue to challenge the Tax.

According to defendant, Congress intended this Court to entertain a tax challenge only after an exporter had protested its payment of the tax. Defendant garners support for this interpretation from the statutory language directing the court to treat the tax as a customs duty for the purpose of jurisdiction. If the court properly is to treat the tax as a customs duty, defendant contends, the protest procedures under subsection 1581(a) must govern.

Further, defendant argues, there is a Customs decision for the parties to protest—Customs' decision to accept payment. (Tr. at

25.) Defendant contends administration of the Tax is not merely ministerial, because subsection 4462(i), title 26, United States Code authorizes Customs, through the Department of the Treasury, with administering the assessment of the Tax. Defendant claims Congress has delegated substantial authority to the Secretary of the Treasury (1) to determine the method of payment and collection of the Tax; (2) to exempt certain transactions from the Tax where collection would be impracticable; and (3) to provide for mitigation of penalties and the settlement of claims. Defendant claims this grant of power gives the Secretary of the Treasury "near plenary authority to 'carry out the purposes' of the Act." (Def.'s Mem. in Opp'n to *Amici* at 34.) Accordingly, defendant contends, Customs' power to administer the Tax transcends a ministerial role.

Defendant cites a number of authorities in support of its position. In *Norfolk & Western Railway Co. v. United States*, 18 CIT ——, 843 F.Supp. 728 (1994), defendant asserts the court found the assessment of a user fee similar to the Tax constituted a protestable decision, and the period for filing the protest began when Customs decided the plaintiff would have had to pay the fee. In *General Motors Corp. v. United States*, 10 CIT 569, 643 F.Supp. 1139 (1986), defendant contends the court held administrative procedures, where available, had to be exhausted even before Customs issued its decision. According to the defendant, although the court found the obligation to pay the charges was derived from statute, payment of the duties was pursuant to section 1514, and therefore protestable. The fact that Customs took no affirmative action to collect the duties but only accepted or rejected certain offers, defendant argues, did not alleviate the need for protest.

These arguments are unpersuasive. Section 1581(a) permits review of protest denials by Customs for only certain final decisions enumerated in 19 U.S.C. § 1514(a). *See* 28 U.S.C. § 1581(a); 19 U.S.C. § 1515. For a party to be able to protest and obtain jurisdiction pursuant to section 1581(a), Customs first must have made a decision. *See* 19 U.S.C. § 1514(a), (c) (1988 & Supp. V 1993)

(noting Customs decisions are final unless protested and that such protests must "set forth distinctly and specifically" each decision protested).

■ Acceptance of payment of duties owed does not constitute a protestable decision. *See Dart Export Corp. v. United States*, 43 CCPA 64, 74, C.A.D. 610, 1956 WL 8339 (holding Customs' acceptance of estimated duties tendered did not constitute decision), *cert. denied*, 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 48 (1956); *Best Foods, Inc. v. United States*, 37 Cust.Ct. 1, 9–10, 147 F.Supp. 749, 756–57 (1956) (holding payment of customs duties at time of entry not decision for purpose of computing time to file protest). Customs plays little role in accepting the payments; rather, they arrive at a "postal rental box serviced by a commercial bank that processes [Harbor Maintenance Fund] payments and deposits them to the United States Treasury." United States General Accounting Office, *U.S. Customs Service: Limitations in Collecting Harbor Maintenance Fees*, GAO/GGD–92–25, at 5 (Dec. 1991). As recognized by this court in *Carnival*, it would be impossible to protest the Tax as "there was no decision of Customs which [plaintiffs] could protest." 18 CIT at ——, 866 F.Supp. at 1441.

Neither the Harbor Maintenance Tax statute, nor its regulations, require a decision from Customs. As previously noted, the statute imposes a Tax on commercial cargo at loading for exports and unloading for imports. 26 U.S.C. § 4461(c)(2). Liability is an *ad valorem* percentage of the cargo value. 26 U.S.C. § 4461(b) (Supp. V 1993). Value is determined by standard commercial documentation. 26 U.S.C. § 4462(a)(5)(A). Thus Congress, and not Customs, has set the time of imposition and the amount of the Tax. The regulations require exporters to pay port "use fees" on a quarterly basis and mail their payment with a quarterly summary report or cover letter identifying the exporter to Customs' post office box in Chicago. 19 C.F.R. § 24.24(e) (1995). Exporters may request refunds by mailing an amended quarterly summary report with a copy of the quarterly summary report for the quarter(s) in which they request a refund to the Chica-

go post office box, *id.,* or alternatively by filing with Customs Headquarters through general provisions for claims not otherwise provided for by the regulations, 19 C.F.R. § 24.73 (1995). None of these procedures requires Customs to judge the constitutionality of the Tax, and cannot be considered decisions with respect to payment. These actions are merely ministerial in nature. Although there may be circumstances where Customs might exercise discretion in administering and enforcing the Tax, this discretion does not extend to a determination on the constitutionality of the Tax.

In this case, there are no issues of classification or similar issues which would be part of a protestable decision. In *Mitsubishi Electronics America, Inc. v. United States,* 12 Fed.Cir. (T) ——, ——, 44 F.3d 973, 976 (1994), the Federal Circuit held Customs does not make protestable decisions concerning antidumping duties under 19 U.S.C. § 1514(a). The Court of Appeals emphasized that Customs only performed a ministerial function in collecting such duties under the direction of the Department of Commerce, and Customs did not conduct an investigation, determine rates and margins, or issue antidumping orders. 12 Fed.Cir. (T) at ——, 44 F.3d at 977. Plaintiff and *amici* do not argue that they have overpaid the amount of the Tax; rather, their challenge goes to the heart of the constitutionality of the statute itself, a matter outside of Customs' authority. *See generally McCarthy v. Madigan,* 503 U.S. 140, 147–48, 112 S.Ct. 1081, 1087–88, 117 L.Ed.2d 291 (1992) (noting agency may be unable to consider whether relief should be granted, because of lack of institutional competence to resolve issues presented). Similarly, in *United States Cane Sugar Refiners' Ass'n v. Block,* 3 CIT 196, 201, 544 F.Supp. 883, 887, *aff'd,* 69 CCPA 172, 683 F.2d 399 (1982), in which protest was not required, Customs could not change the scope of the Presidential Proclamation as to over-quota sugar. Much like *Mitsubishi* and *Cane Sugar Refiners',* there is no decision by Customs as to whether it will assess the Tax.

Customs does not determine the application, policies, or rates of the Tax, but merely serves to implement its provisions. As dis-

tinguished from *National Corn Growers Ass'n v. Baker,* 6 Fed.Cir. (T) 70, 840 F.2d 1547 (1988), where the policies and rates in question were those of Customs, and "peculiarly within the ambit of the Customs Service to correct," 6 Fed.Cir. (T) at 82, 840 F.2d at 1556, Customs is powerless to correct the constitutional infirmities raised by plaintiff. *See Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977) (finding administrative hearing procedures unsuited to resolving constitutional issues). In short, Customs must simply follow the path enacted by Congress.

Moreover, neither of defendant's proffered cases, *Norfolk* nor *General Motors,* supports its position. The protestable decision in *Norfolk*—an assessment of a user fee—is distinguishable from the present case. In *Norfolk,* the protestable decision was Customs' particular application of a statute. 18 CIT at ——, 843 F.Supp. at 733. Customs' decision was limited to whether a vessel constituted a ferry or a barge, not whether the application of the user fee was constitutional.

*General Motors* is equally inapposite. The issue concerned whether car radio components imported into the United States as original motor-vehicle equipment were diverted for other uses, and therefore subject to penalty. 10 CIT at 570, 643 F.Supp. at 1139–40. Defendant argues the court found *"payment* [of duties] equated to the protestable event," even though the duty to pay was derived from statute, and not a Customs decision. (Def.'s Br. in Opp'n to *Amici* at 32.) This argument is misplaced. Plaintiff only paid the diversion duties "[o]nce Customs indicated to plaintiff that it *considered* the merchandise diverted." 10 CIT at 575, 643 F.Supp. at 1143 (emphasis added). Customs made a decision in finding General Motors had diverted the radios. Again, Customs did not consider the constitutionality of the statutory scheme as a whole.

Defendant's own arguments support Customs' inability to make a decision as to the constitutionality of the Tax. Defendant initially argues, "[t]he decision requiring the payment is the law itself, the compulsion to pay is provided by the statute itself. The decision is the decision to accept payment

from the exporter." (Tr. at 26.) Defendant subsequently qualifies this statement, noting, "[i]t isn't a decision by Customs to accept and retain the money, it has no authority to return it unless the proper procedures have been followed, which are filing of a protest and a denial of a protest." *Id.* at 59. Such reasoning is circular. For plaintiffs to file a valid protest, Customs must have made a protestable decision. As a decision, according to the defendant, can only be made after the protest is filed, no protestable decision exists.

Finally, certain *amici* contend the denial of a refund request pursuant to 19 C.F.R. § 24.24(e)(5) is a protestable decision, and that subsection 1581(a) would provide the appropriate basis for jurisdiction. Although Customs has discretion to decide whether it is able to refund payments of the Tax, such discretion is limited and does not extend to determinations of constitutionality. As Customs does not have the power to decide the constitutionality of the Tax, the court finds protestable decisions pursuant to the refund provision of subsection 24.24(e)(5) are limited to decisions pertaining to the administration of the Tax, not its constitutionality.

### B.

Subsection 1581(i) embraces the issues contested as to the Harbor Maintenance Tax. It provides, in pertinent part,

> (i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—
>
> (1) revenue from imports or tonnage;
>
> .    .    .    .    .;
>
> (4) administration and enforcement with respect to the matters referred to in

paragraph (1)–(3) of this subsection and subsections (a)-(h) of this section.

28 U.S.C. § 1581(i). Congress directed the Tax be treated as a customs duty for purposes of jurisdiction. Such duties, by their very nature, provide for revenue from imports, and are encompassed within subsection 1581(i)(1).

Congress similarly intended the administration and enforcement of the Tax to be treated as the administration and enforcement of a customs duty. 26 U.S.C. § 4462(f)(1). Thus, jurisdiction lies under subsection 1581(i)(4) as it relates to subsection 1581(i)(1).

In sum, jurisdiction is provided by 28 U.S.C. § 1581(i).

### V

The court finds the Harbor Maintenance Tax, as it applies to exports unconstitutional. Plaintiff's motion for summary judgment is granted; defendant's cross-motion for summary judgment is denied. Parties are to submit a proposed judgment in conformity with the opinion within 20 days.

MUSGRAVE, Judge, concurring.

I concur in the opinion that the Harbor Maintenance Revenue Act (the "Act") is unconstitutional as it applies to exports and that the plaintiff U.S. Shoe is entitled to the remedy it requests, namely a refund of export taxes going back two years from the time it filed its complaint. Nevertheless, I offer some additional comments addressing the jurisdictional issue and the prayers of certain *amici* for a full refund of all taxes illegally collected from them since the implementation of the Act.[1] In my view, the manifestly inadequate administrative protest procedure under 28 U.S.C. § 1581(a) is a further reason that 28 U.S.C. § 1581(i) jurisdiction arises; moreover, complainants are entitled to a restitution of all taxes heretofore exacted under the Act in violation of the Export Clause of the United States Constitu-

---

1. *E.g., "Amici* respectfully join in plaintiff's request that this Court find the HMT unconstitutional, strike it down, and direct pursuant to the power granted it under 28 U.S.C. § 1585 that *all*

*HMT payments unlawfully collected be refunded,* together with such other and further relief as may be appropriate." (*Amici* Texaco *et al.*'s Mem.Supp.Summ.J. at 2) (emphasis added).

tion.[2] This latter position is compelled by the Fifth Amendment Due Process Clause enjoining the deprivation of "life, liberty, or property, without due process of law."

I

As an initial matter, recent opinions of the Court of Appeals for the Federal Circuit and this Court have ruled unambiguously that a *decision* by the Customs Service ("Customs") is a condition precedent for section 1581(a) jurisdiction to arise. *Mitsubishi Electronics of America, Inc. v. U.S.*, 44 F.3d 973 (Fed. Cir.1994); *Carnival Cruise Lines v. U.S.*, 18 CIT ——, 866 F.Supp. 1437 (1994). As the Court's opinion makes abundantly clear, there is no *decision* involved in Customs' collection of these unconstitutional taxes because Customs lacks discretion in the performance of its delegated ministerial duties. In addition to this reason, however, there is a further justification for the Court to invoke its section 1581(i) jurisdiction in this case: requiring plaintiffs to pursue a remedy under the protest procedures mandated by section 1581(a) would oblige them to follow a manifestly inadequate and utterly futile procedure.

Certain *amici* argue that a party could presumably request a refund as set forth in 19 C.F.R. §§ 24.24(e)(5) or 24.73, obtain a denial of refund from Customs, and then protest that decision of Customs to deny the refund by way of the administrative protest process prescribed by 19 U.S.C. §§ 1514 and 1515. According to these *amici*, the Court could dismiss as not ripe for adjudication those actions which were filed prior to Customs denying a refund request, but instead should waive exhaustion of administrative remedial procedures and assert jurisdiction under section 1581(i), as such procedures are inadequate for the type of relief sought. (Br. of *Amici Curiae* Aris–Isotoner, *et al.*, at 14–22.) Plaintiff and nearly all *amici* argue that the available administrative protest remedy set forth in 19 U.S.C. §§ 1514 and 1515 is futile and manifestly inadequate under the circumstances. The ultimate issue presented by such arguments is whether administrative remedies set forth by statute and regulations are appropriate when a party seeks a refund of payments mandated by an act of Congress by challenging such act as unconstitutional.

The administrative remedial procedure as it applies to refund requests is clearly not meaningful or adequate under the given circumstances. *See generally McCarthy v. Madigan*, 503 U.S. 140, 144–149, 112 S.Ct. 1081, 1085–89, 117 L.Ed.2d 291 (1992) (explaining circumstances in which administrative remedies need not be exhausted); and *Conoco v. Foreign Trade Zones Board*, 18 F.3d 1581 (Fed.Cir.1994) (holding section 1581(a) jurisdiction inappropriate where it is futile or manifestly inadequate). Most importantly, as the Court's opinion makes clear, Customs does not have authority to refund Tax payments or otherwise grant effective relief for constitutional claims. It is well settled that an administrative agency lacks the authority to declare an act of Congress unconstitutional. *See Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions."). Hence, under the circumstances of this case Customs is compelled to deny any administrative refund claim, making a request for refund a futile act.

Moreover, Customs has predetermined the issue before it. As plaintiff points out, Customs' denial of protests challenging the constitutionality of the Harbor Maintenance Tax (26 U.S.C. §§ 4461 and 4462, hereinafter the "Tax") is a foregone conclusion. (Pl.'s Mem. Supp.Summ.J. at 15–16.) Customs routinely denies all of the protests it receives in connection with Tax payments. The denial is a form letter simply asserting in one sentence that the levy is not an unconstitutional tax but a statutorily mandated user fee.[3] Such routine denial demonstrates that filing refund requests with Customs on grounds of unconstitutionality is clearly a futile act.

---

**2.** The other jurists on this panel are not in accord with the comments addressing the remedy issue.

**3.** Declaration of Charles Davies, Director—User Fee Task Force, Headquarters Office of Inspection and Control at 6, and attachments.

Lastly, requiring a party to file for refunds may unduly prejudice that party. "[P]rejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *McCarthy*, 503 U.S. at 147, 112 S.Ct. at 1087. The administrative refund processes set forth under 19 C.F.R. §§ 24.24(e)(5) and 24.73 do not provide a time frame for the resolution of a claim for refund. This Court has recently deemed it appropriate to waive exhaustion of administrative remedies because they were not clearly delineated and because they set up indefinite timetables. *B–West Imports v. United States*, 19 CIT ——, 880 F.Supp. 853 (1995). The administrative refund procedures are similarly indefinite and are therefore inadequate under the circumstances of the present case.

Before this Court may exercise jurisdiction over this matter by way of section 1581(i), there must be terms within the language of that section which cover the issues plaintiff brings before the Court. *Conoco*, 18 F.3d at 1588–89. Defendant argues that section 1581(i) by its own terms fails to provide a jurisdictional basis for a constitutional challenge to the Tax because plaintiff's claims are based upon payments associated with exports, while the express terms of subsections 1581(i)(1) and (2) apply only to imports. (Defs.Mem. Supp. Summ. J. at 24.)

The terms of section 1581(i) make clear that the Court has jurisdiction over any civil action that arises out of any United States *law* providing for the matters set forth in the statute. Defendant's reading of section 1581(i) would eliminate that all-encompassing term and in effect grant the Court jurisdiction only over the specific matters set forth in subsections 1581(i)(1)–(4), but not the *laws* dealing with those matters. Such an interpretation would mean that this Court would have jurisdiction over the Tax as it applies to imports, the district courts would have jurisdiction over the Tax as it applies to exports, and it is uncertain as to which court would have jurisdiction over the Tax as it applies to, *e.g.*, passenger services.

As the opinion of the Court points out, Congress did not intend for the district courts to exercise jurisdiction over the Tax.

The statutory language of 26 U.S.C. § 4462(f)(2) and its accompanying legislative history indicate Congress' clearly stated intention that this Court have jurisdiction over the Tax. Furthermore, "[S]ection 1581(i) was intended to give the Court of International Trade broad residual authority over civil actions arising out of federal *statutes* governing import transactions and to eliminate the confusion over whether jurisdiction lay in the Court of International Trade or the district courts." *Conoco*, 18 F.3d at 1588 (emphasis added). Thus it was the intent of Congress for this Court to exercise jurisdiction over the entire Tax, not just those portions of the Tax that are covered under the specific subsections 1581(i)(1)–(4).

The terms of section 1581(i) embrace the Tax. This Court has found that the Tax is a law which provides for revenues from imports and exports, and for the administration and enforcement with respect to those revenues including the protest process. Therefore, subsections 1581(i)(1) and (4) provide this Court with jurisdiction over the Tax.

In sum, Customs has not made a decision with respect to the Tax upon which a valid or meaningful protest may be predicated. Defendant's arguments simply ignore that necessary prerequisite to the protest process set forth under 19 U.S.C. §§ 1514 and 1515. Moreover, under the circumstances of this case, it is futile and manifestly inadequate to await a decision by Customs with respect to an administrative refund request. As required, the terms of section 1581(i) cover the issues that plaintiff brings before the Court. The Court's jurisdiction is therefore properly asserted over this matter by way of section 1581(i). The Court is authorized by statute to exercise discretion in requiring exhaustion of administrative remedies. 28 U.S.C. § 2637(d). Having found jurisdiction under section 1581(i), pursuant to this Court's discretionary powers under 28 U.S.C. § 2637(d), and for the reasons previously discussed, it is inappropriate to require exhaustion of any administrative remedy when, as in this case, a party requests a refund by challenging the constitutionality of an act under which payment was made.

## II

It is the duty of this Court to exercise judicial review over Congressional acts within its jurisdiction, and "[s]hould Congress, in the execution of its powers, adopt measures which are prohibited by the Constitution . . . it would become the painful duty of this tribunal . . . to say, that such an act was not the law of the land." *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 423, 4 L.Ed. 579 (1819). As the opinion of the Court details, there is no question that the Act violates the Export Clause. Insofar as the Act therefore is not the law of the land, it is void *ab initio:* "an invalid exercise of the power of Congress . . . [is] as inoperative as if it had never been passed, for an unconstitutional act is not a law, and can neither confer a right or immunity. . . ." *Chicago, I. & L.R. Co. v. Hackett,* 228 U.S. 559, 566, 33 S.Ct. 581, 584, 57 L.Ed. 966 (1913). When the invalid act is the federal government's unconstitutional exaction of taxes, taxpayers' rights under the Due Process Clause of the Fifth Amendment are implicated. "Thus, if a plaintiff seeks the return of money taken by the government in reliance on an unconstitutional tax law, the court ignores the tax law, finds the taking of the property therefore wrongful, and provides a remedy." *Reynoldsville Casket Co. v. Hyde,* — U.S. —, —, 115 S.Ct. 1745, 1752, 131 L.Ed.2d 820 (1995) (Scalia, J., concurring).

A tax refund is the only appropriate remedy for the government's illegal collection of revenue under the Act. Because the tax violates the Export Clause, it was "beyond the [government's] power to impose, . . . [and the government has] no choice but to undo the unlawful deprivation by refunding the tax previously paid under duress, because allowing the [government] to collect these taxes by coercive means and not incur any obligation to pay them back . . . would be in contravention of the [Due Process Clause]." *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U.S. 18, 39, 110 S.Ct. 2238, 2251, 110 L.Ed.2d 17 (1990). Yet an attempt to collect all moneys illegally exacted since the tax's incipience in 1987 ostensibly conflicts with the two-year statute of limitations applicable generally to claims brought under 28 U.S.C. § 1581(i). Due to the peculiar circumstances of this case, however, enforcing the statute of limitations would impermissibly infringe constitutional rights guaranteed under the Fifth Amendment Due Process Clause.

The United States Supreme Court has held that "[a] constitutional claim can become time-barred just as any other claim can. . . . Nothing in the Constitution requires otherwise." *Block v. North Dakota,* 461 U.S. 273, 292, 103 S.Ct. 1811, 1822, 75 L.Ed.2d 840 (1983). While valid claims based upon unconstitutional acts by the federal government may at some time become stale or deemed waived, an attempt, as here, at interposing a very short statute of limitations runs afoul of due process and flaunts the sovereign's role as, among other things, protector of rights of its citizens, from whom *this* government, almost uniquely when it was created, acquired all of its powers. And here, the legislative history reflects that the drafters of the Act were abundantly aware of the constitutional infirmity of the Act; this being true, enforcing the foreshortened statute of limitations is to reward the perpetration of an overtly unconstitutional action.

The Bill of Rights incorporates those indefeasible rights which the citizens decline to surrender to the sovereign, and it is this very feature of our constitutional democracy—that the government is empowered only to the extent that citizens surrender their rights— which distinguishes it from other political systems in which people derive their rights only from the state. Although the federal government enjoys broad immunity, this immunity does not extend to unconstitutional behavior, and a statute of limitations that operates in violation of the Due Process Clause constitutes an invalid exercise of the power of Congress which does not immunize the government from suit.[4]

---

4. *See* Akhil R. Amar, *Of Sovereignty and Federalism,* 96 Yale L.J. 1425, 1427 (1987) ("[W]henever a government entity transgresses the limits of its delegation [of powers] by acting *ultra vires,* it ceases to act in the name of the sovereign, and

[T]he exercise by Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation.[5]

*Battaglia v. General Motors Corp.,* 169 F.2d 254, 257 (2d Cir.1948). "[T]o hold otherwise would be to create the possibility that Congress could act unconstitutionally and then attempt to shield its action from review by virtue of sovereign immunity." *Bartlett v. Bowen,* 816 F.2d 695, 708 (D.C.Cir.1987). Thus, it is to no avail that the interlocutor points to the jurisdictional nature of the statute of limitations presently under consideration. Moreover, "The courts ... have recognized a principle that the constitutional guarantee of an independent judiciary limits the legislature in the exercise of its power to regulate court jurisdiction." *Bartlett,* 816 F.2d at 705. The judicial branch must not countenance the disenfranchisement of democratic constitutional rights in deference to the royal cloak of sovereign immunity. To do so would be to abrogate the judiciary's proper role as protector and final arbiter of constitutional rights, a role implicit in the separation of powers established by our constitutional scheme and made decisively explicit in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

The Supreme Court has recognized that procedural requirements in tax refund cases must satisfy all the provisions of the Constitution. Discussing procedural obstacles which might bar a refund of state taxes collected in violation of the Constitution, the Court declared, *"Depending upon whether or not this independent rule satisfied other pro-*

*visions of the Constitution,* it could independently bar the taxpayers' refund claim." *Hyde,* —— U.S. at ——, 115 S.Ct. at 1750 (emphasis added). In this vein the Court has indicated that states may enforce "relatively short statutes of limitation applicable to such actions." *McKesson,* 496 U.S. at 45, 110 S.Ct. at 2254 (citing Florida's three-year statute of limitations for tax refund suits). Although states may promulgate statutes of limitations in connection with tax refund statutes, they are bound to provide substantive relief for revenue exacted in violation of the Constitution. A state's post-deprivation tax refund regime must afford "an opportunity to contest the validity of the tax and a 'clear and certain remedy' designed to render the opportunity meaningful by preventing any permanent unlawful deprivation of property." *McKesson,* 496 U.S. at 40, 110 S.Ct. at 2252 (quoting *Atchison, T. & S.F.R. Co. v. O'Connor,* 223 U.S. 280, 285, 32 S.Ct. 216, 217, 56 L.Ed. 436 (1912)). Moreover, when a state places

> a taxpayer under duress promptly to pay a tax when due and relegates him to a post-payment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide *meaningful backward-looking relief to rectify any unconstitutional deprivation.*

*Id.* at 31, 110 S.Ct. at 2247 (emphasis added).

In tax refund cases the Fifth Amendment Due Process Clause does not endow the federal government with the flexibility the states enjoy when fashioning schemes to redress unconstitutional exactions. The relevant *state* obligations under the Fourteenth Amendment Due Process Clause owe their flexible nature to principles of federalism and comity:

> We have long recognized that principles of federalism and comity generally counsel

---

surrenders any derivative "sovereign" immunity it might otherwise possess.").

**5.** *See also International Tel. & Tel. Corp. v. Alexander,* 396 F.Supp. 1150, 1163 n. 31 (D.Del. 1975) (discussing federal tax protest and remedy statutes and declaring, "As previously noted, both statutes are jurisdictional and are within the

power of Congress to enact pursuant either to Art. III, § 1 of the Constitution or the sovereign immunity of the federal government.... These respective sources of power, however, cannot be utilized by Congress to shield from judicial review governmental action violative of constitutional guarantees.").

that courts should adopt a hands-off approach with respect to state tax administration.... [T]his Court [has repeatedly] shown an aversion to federal interference with state tax administration.... The reluctance to interfere in state tax collection ·continued in *McKesson,* in which we confirmed that the States are afforded great flexibility in satisfying the requirements of due process in the field of taxation. *National Private Truck Council v. Oklahoma Tax Comm'n,* —— U.S. ——, ——, 115 S.Ct. 2351, 2354, 132 L.Ed.2d 509 (1995) (citation omitted). In the instant case, there exists no question of "comity" between the federal government and a state, and under *McKesson* and its progeny, a two-year statute of limitations in tax refund cases may well be unconstitutional at the state level. Although there is no precedent directly on point, it is evident that in this case, the more stringent due process obligations incumbent on the federal government entail that enforcing the two-year statute of limitations would infringe Fifth Amendment rights by, *inter alia,* failing "to provide meaningful· backward-looking relief to rectify any unconstitutional deprivation."

There is no need to speculate on a constitutionally permissible term for a statute of limitations in this type of case. Having found the statute of limitations inapplicable, it is my opinion that the imperatives of due process require a full refund back to the date of the Act's implementation, *i.e.,* 1987 (the bulk of unconstitutional exactions appear to have occurred subsequent to the increase of the tax from .04% to .125%, in 1991). Although the government has a legitimate interest in orderly and predictable tax administration, Justice O'Connor explained that "*McKesson* makes plain that equitable considerations are of limited significance once a constitutional violation is found." *American Trucking Ass'ns v. Smith,* 496 U.S. 167, 184, 110 S.Ct. 2323, 2334, 110 L.Ed.2d 148 (1990). Any misplaced concern for visiting hardship upon the government by requiring a complete refund of the unconstitutionally exacted

taxes is dispelled by the fact that at the end of fiscal year 1994, the fund generated by the Act contained a $453 million *surplus,*[6] while the total sums collected since the Act's inception amounted to $2.7 billion, $700 million of which was derived from unconstitutional export taxes. (Def's.Mem.Supp.Summ.J. at 5). Furthermore, the fund's cumulative surplus is expected to balloon to nearly $1.7 billion by the end of fiscal year 1999.[7] Under .the circumstances, restitution of all unconstitutional exactions collected since the Act's implementation is appropriate where such relief is requested.

---

**6.** Dept. of the Treasury, Financial Management Service, Funds Account Branch, Harbor Maintenance Trust Fund Income Statement and Balance Sheet, 10/1/93–9/30/94.

**7.** Army Corps of Engineers Internal Briefing Outline (Feb. 2, 1995).